[Civ. No. 32039. Second Dist., Div. Three. Feb. 24, 1969.]

SOCIAL WORKERS UNION LOCAL 535 et al., Plaintiffs and Appellants, v. COUNTY OF LOS ANGELES et al., Defendants and Appellants.

Harold W. Kennedy and John D. Maharg, County Counsel, George W. Wakefield and Edward H. Gaylord, Assistant County Counsel, for Defendants and Appellants.

Levy, DeRoy, Geffner & Van Bourg, Leo Geffner, Abe F. Levy and Howard L. Berman for Plaintiffs and Appellants.

COBEY, J. — These are cross-appeals in a mandamus, injunctive and declaratory relief action by plaintiff Union and certain individual plaintiffs on the one hand and defendant Los Angeles County and certain of its officials on the other[1] from a judgment declaring invalid one of the actions which occurred upon the conclusion of the county social workers strike in June 1966, and upholding the validity of another. The action declared invalid was the imposition of the loss of

---

[1] The full name of plaintiff Union is "Social Workers Union Local 535 Building Service Employees International Union, AFL-CIO." The defendants, other than Los Angeles County, are the five members of the board of supervisors, collectively and individually, and L. S. Hollinger, the county's chief administrative officer.

certain fringe benefits (relating to salaries, sick leaves and vacations) upon county employees who participated in the strike. The action upheld was the enactment of ordinance No. 9134, which authorized the payment of a one-time bonus to those employees in affected positions who remained at work during the strike.[2]

For reasons which we shall hereafter state, we disagree with the trial court's conclusion that adherence on the part of the County to the strike settlement made with the Union required it to grant to employees involved in the strike a retroactive unpaid leave of absence for the period of the strike. We agree, however, with the trial court's conclusion that the special ordinance (No. 9134) authorizing the payment of a one-time bonus to those employees who remained at work in the affected department during the strike was a valid ordinance.

### The Strike

The strike was precipitated by the board of supervisors' change of mind with regard to granting county social workers an 11 percent increase in salary. On May 26, 1966, they indicated that they would grant such an increase, but on May 31, they reduced the increase to 5½ percent in accordance with the recommendation of the chief administrative officer, L. S. Hollinger. The Union membership thereupon voted to strike and picket lines appeared before the affected county buildings on the morning of June 2.

About 1,980 of the approximately 2,600 social workers employed by the County went out on strike. The picket lines were respected throughout the strike by approximately 80 employees of the bureau of public assistance within the department of charities who were members of Local 434, a sister local to the Union and one which included county

---

[2]The Union has also appealed from that portion of the judgment declaring that the county superintendent of charities is not obligated to meet with the Union to resolve issues affecting working conditions and problems involving social workers within the department's jurisdiction or to reduce to a written agreement between the department and the union any resolution of such issues. The Union has not argued this point either in its brief or in oral argument. We, therefore, deem that this point has been abandoned. (See *Wheeling* v. *Financial Indem. Co.*, 201 Cal.App.2d 36, 44-45 [19 Cal.Rptr. 879].)

Immediately following the strike the board of supervisors restored the 5½ percent pay increase of social workers, the loss of which had started the strike.

employees other than social workers. The strike lasted almost three weeks, that is from June 2 to June 20.

The day the strike started Hollinger tried to end it quickly by posting and distributing a memorandum to all county social workers and to the Union, in which he pointed out that under the county salary ordinance an employee who is absent from his duties without leave for more than three consecutive calendar days breaks his continuity of county service, automatically and mandatorily takes a new anniversary date of county employment and thereby loses specified salary, sick leave and vacation benefits.[3] This move to end the strike at its inception failed. On June 8, the board of supervisors, which apparently was refusing on both a collective and individual basis to deal with the strikers while they were on strike and to recognize formally the existence of the Union, by formal order instructed Hollinger and William A. Barr, the county superintendent of charities[4] and the head of the county department in which practically all social workers were employed, to confer with "employees' representatives,"

---

[3]Copies of this memorandum were distributed to all district offices of the bureau of public assistance within the department of charities and posted on bulletin boards in all district offices. In addition, copies were placed with the time cards of all of the employees in bureau of public assistance offices. In all, some 2,000 copies of this memorandum were distributed.

This memorandum reads in full as follows:

"June 2, 1966

"To: All County Department Heads

"FROM:. L. A. [*sic*] Hollinger

"After lengthy discussion with the County Counsel, I am concerned that employees may not be aware of the effects of unauthorized absences on many of their benefits. As defined in the County Salary Ordinance, an employee who is absent from his duties without leave for *more than three consecutive calendar days*—including weekends and holidays, has broken his continuous service, and automatically

"(1)—takes a new anniversary date and must begin to earn his next step advance.

"(2)—loses all current year full and part pay sick leave.

"(3)—loses all earned vacation if he has less than one year of service.

"(4)—loses his credit toward the third and fourth week of vacation if he has had a prior break in service.

"Each of these losses is mandatory under the law and cannot be waived.

"I am sure you agree that all employees should be fully informed of these important facts. Therefore, please make every effort to bring the matter to the attention of each of your employees as soon as possible.

"LSH c"

[4]By an amendment to the county charter subsequent to the strike and its settlement, the designation of the superintendent of charities was changed to, "Director of Hospitals, Director of Public Social Services and Director of Adoptions."

and to review "the functions, responsibilities and workload of social workers; . . ." Hollinger, nevertheless, had no personal contact with the Union during the strike, but he was in almost daily communication with Barr about the strike.

Two days later Barr met very briefly with representatives of the Union at the county federation of labor headquarters and discussed with them the Union's three well-publicized strike demands. These were: (1) that the County restore the 11 percent pay increase; (2) that it enter into negotiations with the Union for a collective bargaining agreement; and (3) that there be no reprisals on the part of the County against any employees because of the strike. At this meeting Barr obtained the definite impression that it would take something in writing from the County to the Union in order to settle the strike.

Throughout the strike regular morning meetings were held by the chief administrative officer, the county counsel, the director of charities and their top assistants to discuss the progress and effect of the strike and to decide upon what action, if any, the County should take. One of these meetings began on Wednesday, June 15, about 9 a.m., in the chief administrative officer's conference room. It was attended by Hollinger, Barr and George W. Wakefield, the acting county counsel, and several of their assistants. It lasted for approximately three hours. At or prior to this meeting Hollinger had also reached the conclusion that it would take some form of written document to the Union in order to settle the strike. At this meeting Barr suggested that a written statement of his position as head of the affected department be drafted and sent to the Union. This suggestion was immediately accepted by those present and all three of the principals together with their assistants participated in the drafting of a letter from Barr to the president of the Union. Upon its completion, Barr immediately signed this letter and two copies of it, on his stationery but in Hollinger's envelopes, were immediately hand-delivered by one of Hollinger's messengers to the Union headquarters that same afternoon.

In this letter, Barr stated in numbered paragraphs essentially that he would meet and confer with representatives of the Union "concerning employment conditions and employer-employee relations . . . in a genuine effort to resolve . . . points at issue and to reduce to writing any agreement

reached on each of those points;" that those employees absent from work during the strike would not be paid for their unauthorized absence from work, but that they would "not incur disciplinary action because of their absence" during the strike; that since it was essential to restore the full range of services of the Bureau of Public Assistance, "intensive recruitment activities will be undertaken" after June 20, the next Monday, and that he was sure that, if the unauthorized absences from work were ended, the board of supervisors would restore the 5½ percent salary increase.[5]

The letter was silent concerning the mandatory and automatic loss of fringe benefits occasioned by the break in the

---

[5]This summary of the contents of this letter is a paraphrase. In the letter itself neither the words "Union" nor "strike" appear. Under the Meyers-Milias-Brown Act (*Gov. Code,* §§ 3500-3511), a public employer is not required to bargain collectively with an employee organization, but merely to meet and confer with such organization as the representative of its members employed by such public employer in regard to, generally, their employment conditions. (Gov. Code, §§ 3500, 3501 subd. (a), 3503, 3504, 3505.)

This statute says nothing with respect to the right of the public employees covered by it to strike except in a negative way. In this respect it declares that Labor Code section 923 shall not apply to public employees. This last mentioned statute declares it to be the public policy of this state that ". . . [T]he individual workman . . . shall be free from the interference, restraint or coercion of employers of labor, or their agents, in the designation of such representatives or in self-organization or in other concerted activities for the purpose of collective bargaining or other mutual aid or protection."

The letter read in full as follows:
"June 15, 1966
"Mr. Buster Price, President
Social Workers Union 535
AFL-CIO
1313 West 8th Street
Los Angeles, California 90017
"Dear Sir:
"I am seriously concerned with the present situation and want to make my position clear.

"1. I recognize my obligation to meet and confer with your representatives concerning employment conditions and employer-employee relations. It has been my policy to meet with your representatives upon request and I will continue to do so in the future. Obviously there are points at issue in these areas that have not been resolved. My staff and I stand ready to meet with you in a geninue effort to resolve these points at issue and to reduce to writing any agreement reached on each of those points.

"2. Compensation cannot be provided to employees of the County of Los Angeles who have been absent without authorization from their work assignments.

"3. Employees who have been absent from their work assignment [*sic*] without prior approval from June 1 through June 19, 1966, will not incur disciplinary action because of their absence. Such em-

continuity of county service of employees involved in the strike which had been threatened in the Hollinger memorandum. The letter embodied both the carrot and stick approaches as it promised and indicated specific concessions on the one hand and threatened imminent recruitment of strike breakers on the other.

Following receipt of the letter the leaders of the Union decided to invite Barr to the county federation of labor headquarters the next morning, Thursday, June 16, to clarify its meaning in the hope that it could then serve as a strike settlement. Barr accepted the invitation and a meeting commenced about 10 a.m., in the federation headquarters between Barr and two small committees—one representing the Union and the other representing the county federation of labor. The meeting started with the acting chairman, an experienced trade union official, explaining to Barr the purpose of the meeting. He then proceeded to take up with Barr each of the numbered paragraphs of the letter in relation to the aforementioned three principal strike demands of the Union.

As to the third demand of the Union, the absence of reprisals, one of the Union representatives inquired of Barr whether his written promise in paragraph 3 of the letter covered the loss of fringe benefits threatened in the Hollinger memorandum of June 2. At this point the testimony of the four witnesses who testified for the Union in regard to what happened at this meeting and that of Barr present a sharp conflict. Barr testified that he brought a copy of the Hollinger memorandum with him to this meeting, that he told

ployees will be entitled to promotional opportunities and other employment considerations without prejudice.

''4. It is essential that positions which remain vacant in the Bureau of Public Assistance be filled as soon as possible in order that the full range of services of the Bureau can be provided to residents of Los Angeles County without further interruption. After June 20, intensive recruitment activities will be undertaken.

''5. The position of the Board of Supervisors in regard to an additional 5½% salary increase for Social Workers was made very clear to representatives of Local 535 and of the Department of Charities at the budget hearing on June 13, and is not, therefore, a matter which can be resolved at the departmental level. As I have publicly stated, I strongly support increased salaries for Social Workers. I am sure that, were it not for the factor of unauthorized absences from work, this feeling would be supported in a material way by a majority of the members of the Board.
Very truly yours,
WILLIAM A. BARR
Superintendent of Charities''

the Union people there repeatedly that "each of these losses is mandatory under the law and cannot be waived" and that he "went to great lengths to explain" that as a department head he could not prevent the imposition of these losses of fringe benefits.

The five witnesses involved, however, all agree that during the course of this meeting Barr telephoned Wakefield about the problem. There is likewise no disagreement among the three witnesses who testified regarding what Wakefield said over the telephone to Barr and to one of the union people, Susan Adams, to whom he spoke directly at Barr's request. In essence, Wakefield advised both Barr and Susan Adams that since these losses were imposed by the county salary ordinance (No. 6222) they could not be prevented without amendment to that ordinance and that such amendment could be made only by the board of supervisors.[6]

However, conflict in the testimony again develops as to what occurred at this meeting following the receipt by Barr and Adams of the foregoing legal advice from Wakefield. According to the witnesses for the Union, Barr returned to the meeting and told those present that he still thought the problem could be handled administratively at the departmental level, but that, if it could not, it could or would be handled by the adoption of the necessary ordinance amending the salary ordinance.[7]

---

[6] According to Susan Adams' testimony, in her conversation with Wakefield, she inquired of Wakefield whether the problem could be solved by an amendment to the Salary Ordinance and Wakefield replied "that it probably could."

[7] The testimony by the Union witnesses to this effect was as follows:

*Testimony of Susan Adams.*

"As we walked back to the meeting he [Barr] said, 'I still have a feeling that this could be handled at the administrative level, departmental level, administratively, but if it can't, in all events, one way or the other, we can get it settled.'

"So, we went back to the meeting and Mr. Barr reported his conversation with Mr. Wakefield and I supplemented his conversation to this effect, that this would be done; that it would be either a salary ordinance which would nullify the effect of this other salary ordinance, previous salary ordinance, unless it could be settled administratively, at a department level.

" . . . . . . . . . .

". . . He left me with the feeling that it was a matter of being supported by Mr. Barr and the County Counsel and that they [the Board of Supervisors] probably would accept it.

" . . . . . . . . . .

"Q. Mrs. Adams, along the same line of questioning, was it at this

Barr denied that he had said anything like this at the meeting and testified that instead he had merely repeated the advice which Wakefield had given him. The meeting essentially concluded after the union people held a special caucus among themselves. At the conclusion of this caucus the chairman advised Barr that he thought they had a strike settlement which the Union representatives could recommend to the Union's executive board for favorable presentation to the Union membership meeting which was occurring almost immediately. Such recommendation was made at once and the membership meeting was held that noon, Thursday, June 16,

time that Mr. Barr stated to you that he felt the matter could be handled on an administrative or departmental level?

"A. Yes.

"Q. Did he say whether that had ever been accomplished in the past?

"A. Yes.

He said, 'We have done this sort of thing in the past.'

" . . . . . . . . .

"Q. Now, did he say anything further regarding whether if the matter was not resolved through a new ordinance, whether the same purpose could be accomplished through departmental action?

"A. Well, he didn't say it wouldn't be resolved through a new ordinance.

"He said that he thought if he couldn't do it through an administrative procedure the ordinance was not only possible but a very great likelihood—that they would go ahead with it.

"Q. Would be accomplished one way or the other?

"A. Yes.''

*Testimony of Don McCaughan.*

"Q. What was said by Mr. Barr upon his return?

"A. They indicated that—

" .

"THE WITNESS: Mr. Barr said there was a question in the County Counsel's mind, that the County Counsel felt a new ordinance had to be drafted to nullify the original ordinance in order to get this three-day problem out of the way, and Mr. Barr stated that as far as he was concerned he thought it could be handled administratively.

"At that point one of the Social Workers committee people raised the question that this three-day ordinance had been avoided frequently on an administrative level, or at least had been avoided in individual cases on an administrative level.

"And evidently they discussed the example of, as I recall it, some guy that went to the mountains and didn't show up for work for five days, and what they did, they just wrote it off or never appeared in the record or whatever they do to handle it administratively, and this had happened on occasions, and this had never been applied this strictly, and Mr. Barr's statement, well, that was his recollection of how they handled those, and as far as he was concerned he still believed it could be handled administratively, and he brought up the—

"MR. GAYLORD: Excuse me a minute. I don't want to be captious or anything. I know sometimes evidence that is incompetent is, nevertheless, applied if you don't object.

"I would also suggest that the new situations frequently had been

at which Barr's letter was read in full and amplified by oral reports from several of the union conferees present at the meeting. Such reports were in accord with the testimony of the witnesses for the Union to which reference has already been made. On the basis of these reports and this reading of Barr's letter, the membership accepted Barr's letter, as amplified by these oral explanations, as a strike settlement and proceeded to ratify it by an overwhelming vote.

All county employees involved in the strike thereupon returned to work the following Monday morning, June 20. Upon their return to work these employees were given the date of their return to work, namely, June 20, 1966, as a new anniversary date of county employment for the purposes of the aforementioned fringe benefits.

### The Strike Settlement Construed

 The trial court concluded that the County, the board of supervisors and Barr, as county superintendent of charities, had agreed with the Union, as part of the foregoing strike settlement, not to give new anniversary dates to those employees who were involved in the strike and instead to provide them with a retroactive unpaid leave of absence for the period of the strike. It also concluded that these parties were estopped to do otherwise and that their subsequent

handled administratively would not be admitted for the purpose of showing there were such situations.

"THE COURT: I understand. The evidence will be admitted for the limited purpose."

*Testimony of Buster Price.*

"I explained to them [the Union membership meeting] that we had an agreement with Mr. Barr that this would either be handled administratively, at the administrative level, or that an ordinance would be enacted in which ourselves, the County Counsel, and Mr. Barr would become part of a group to sit down and rewrite the ordinance to insure that there would not be this one, reprisals, upon us.

"This question kept coming up again and again, and to my satisfaction, when Mr. Barr came back in the room, we questioned him concerning this. There did not seem to be any problems with that third point about reprisals.

"I based that statement upon the fact, when Mr. Barr came back into the room he said that he had talked to Mr. Wakefield and these reprisals it seems like, as far as he could see, like a small thing and that there was going to be afterward a meeting, that one of two ways it could go, and this again comes back to the same thing. He said this could either be handled administratively or through an ordinance which the Social Workers Union, County Counsel, and himself would sit down and write to change this."

action therefore constituted a violation of the strike settlement made with the Union.

In support of these conclusions of law the trial court found, among other things, that at the June 16 meeting Barr told the union people that he believed that the points covered in the Hollinger memorandum could be handled administratively at the departmental level and if not, "efforts would be made to have the matter taken care of through attempting to get the BOARD OF SUPERVISORS to enact an ordinance which would prevent the . . . employees [participating in the strike] from suffering a loss of fringe benefits upon their return to work."[8]

We do not believe that these findings as to what transpired at the June 16 meeting support the foregoing conclusions of law of the trial court. Certainly the promise to attempt to get the board of supervisors to enact an ordinance which would protect the employees involved in the strike from suffering any loss of fringe benefits pursuant to the county salary ordinance was not an affirmative and unqualified promise that such a loss would be prevented in any event,[9] and is not the type of promise that may be either specifically enforced or made the basis of a promissory estoppel. (Cf. *Jolliffe v. Steele,* 9 Cal.App. 212, 214 [98 P. 544]; *Youngman v. Nevada Irr. Dist.,* 70 Cal.2d 240, 249 [74 Cal.Rptr. 398, 449 P.2d 462].)

The trial court, of course, did not rest these conclusions of law upon its foregoing findings regarding the possible enactment of a protective amendment to the county salary ordinance. It rested them instead upon, among other things, its above finding that Barr told the union people at the June 16 meeting of his belief that the loss of fringe benefits threat-

---

[8]These findings accord with the following language of the trial court's lengthy memorandum opinion, ". . . the Union raised questions about the Hollinger memorandum at the June 16 meeting with Mr. Barr, and the court believes the testimony that Mr. Barr stated that he believed this matter could be handled administratively at the department level and that, if not, efforts would be made to have the matter taken care of through attempting to get the Board of Supervisors to enact an ordinance which would prevent the striking employees from suffering a loss of fringe benefits upon their return to work." They indicate that while the trier of fact rejected Barr's testimony upon this point, he did not accept completely the testimony of the four witnesses for the Union to the contrary.

[9]The record is silent as to whether in fact any such efforts were made by Barr or others in county government.

ened in the Hollinger memorandum could be prevented administratively at the departmental level and its further finding that Barr could have granted the employees involved in the strike retroactive unpaid leaves of absence for the period of the strike pursuant to the authority vested in him by rule 17.02 of the county civil service commission's rules and other relevant provisions of those rules, the county charter and the aforementioned salary ordinance.

· In so construing rule 17.02 the trial court was in error.[10] Rule 17.02 at all times material hereto provided in relevant part as follows:

"Leaves of absence from regular duties without pay *for such purposes as* recovery from a prolonged illness or injury or to restore health, military service, maternity, education or training, assisting another public jurisdiction, may be granted by the appointing power when such leave is in the best interests of the service. . . ." (Italics added).

Rule 17.02 thus empowered Barr to grant unpaid leaves of absence to employees within his department *for purposes of the same kind or character* as those expressly specified in the rule when to do so would be in the best interests of the service. (See *Ventura County* v. *Clay,* 112 Cal. 65, 72-73 [44 P. 488]; *Handlon* v. *Wolff,* 72 Cal.App.2d 53, 58 [164 P.2d 46]; The Random House Dictionary of the English Language, 1966, "such" p. 1420.) There is no similarity whatsoever, however, in kind or character, between the purposes expressly specified in the rule and the purpose of protecting employees retroactively from a loss of fringe benefits occasioned by their absence because of a strike. Therefore, Barr was powerless to avoid in this manner the loss of fringe benefits imposed by the county salary ordinance upon county employees who were away from work for more than three consecutive days by reason of the strike. (See Ordinance 6222, section 19(2)(d).) This being so, no promise so to avoid such loss can be enforced against the County nor can such a promise be made the basis of a promissory estoppel

[10]In reaching this point of decision, it is to be noted that we are assuming, without so deciding, that Barr had authority under his informal instructions, communicated informally to the Union, from the board of supervisors to settle the strike by making a strike settlement with the Union binding upon both the county and the board of supervisors. This assumption is, of course, contrary to the county's position that the strike settlement was with Barr alone as county superintendent of charities and that it could not have been otherwise made.

against the County as such promise was wholly illusory and, therefore, a nullity.[11] (See Civ. Code, §§ 1607, 1667, subd. 2, 3390, subd. 3; Rest., Contracts, §§ 80, 368; 1A Corbin, Contracts, 1963, § 201, p. 223; 5A *Idem.*, § 1170, p. 253; *Crittenden* v. *Hansen,* 59 Cal.App.2d 56, 59 [138 P.2d 37]; cf. *Bard* v. *Kent,* 19 Cal.2d 449, 453 [122 P.2d 8, 139 A.L.R. 1032].)

These holdings make it unnecessary for us to consider, with reference to the strike settlement, the County's further contentions that, particularly because of the illegality of the strike, estoppel could and should not be invoked against the County; that, also because of the strike's illegality, the provisions of the strike settlement could not be enforced against it,[12] and that in any event an insufficient basis otherwise existed for estopping the County by Barr's representations to the Union at the June 16 meeting.[13]

■ We likewise do not think that the granting of a one-time bonus by means of the aforementioned ordinance (No. 9134) to about 4,680 county employees who remained at work in the affected department during the strike was in violation of the strike settlement. In this connection it will be recalled that paragraph 3 of Barr's letter of June 15 read as follows:

"Employees who have been absent from their work assignment [*sic*] without prior approval from June 1 through June 19, 1966, will not incur disciplinary action because of their absence. Such employees will be entitled to promotional opportunities and other employment considerations without prejudice."

Neither in this paragraph nor elsewhere in Barr's letter, which we have set forth in full in footnote 5 to this opinion,

[11]The record contains evidence that in the past *retroactive* unpaid leaves of absence were granted to *individual* employees in the bureau of public assistance of the department of charities by district directors of the bureau. But there was no evidence that such practice with regard to individual employees involved leaves of absence different in kind or character from those expressly specified in rule 17.02.

[12]We do not decide whether or not the strike was illegal, but we would like to point out that illegality of the strike itself does not necessarily render its settlement illegal.

[13]The Union has also attacked the loss of fringe benefits resulting from changing the anniversary dates of all employees involved in the strike to June 20, 1966, on the basis that: (1) such action was not required by section 19 of the salary ordinance and, (2) it was accomplished in an improper manner. We have reviewed the Union's arguments in support of these two contentions and the county's counter arguments and are satisfied that these contentions of the Union are without merit.

is there any reference to how those employees who remained at work during the strike would be treated. The letter was concerned solely with how the strikers and other employees remaining away from work during the strike would be treated on their return to work; it did not concern itself in any way whatsoever with the future treatment of the non-strikers.

### The Validity of the Bonus Ordinance

■ The Union asserts that the bonus ordinance (No. 9134) violates both the state and federal Constitutions. In the latter connection it apparently claims that this ordinance denies those employees who were absent from work during the strike equal protection of the laws within the meaning of that phrase as used in section 1 of the Fourteenth Amendment to the United States Constitution, in that they have been arbitrarily excluded from its benefits although their job duties, as social workers, etc., were not different from those of its beneficiaries. This claim ignores the uncontroverted evidence that those employees who remained at work in the affected department during the strike worked under extraordinary workloads and working conditions. In our opinion this environmental condition in and of itself constituted a reasonable basis for the temporary extra compensation provided by the ordinance.

As regards the state Constitution, the Union takes the position that the bonus ordinance violated two sections—former sections 31 and 32 of article IV[14] which respectively prohibit gifts of public moneys and the retroactive payment of extra compensation to public employees. The trouble with this position is that under *Tevis* v. *City & County of San Francisco,* 43 Cal.2d 190, 196-197 [272 P.2d 757], these sections limit only the powers of the Legislature itself and those powers of local government delegated to it by the Legislature and have no application to charter powers which are constitutional in origin, such as the power of the Los Angeles County Board of Supervisors to alter the compensation of county employees. (See Cal. Const., art. XI, § 7½, subd. 5; Los Angeles County Charter, § 11(1)(3).)

Our holding the bonus ordinance valid makes unnecessary

[14]In the revision of the legislative article effective November 8, 1966, section 31 of article IV became section 25 of article XIII and section 32 of article IV became section 17 of article IV. Moreover, section 32 was restated in more concise language but without any change in meaning.

our consideration of the further contentions of the County that beneficiaries of this ordinance should have been made parties to this litigation and thereby given the opportunity to be heard as to the validity of this ordinance.

Paragraphs 2(a), (b), (c) and (d) and 3 of the judgment are reversed; otherwise, the judgment is affirmed. Costs on appeal shall be recovered only by defendants-appellants.

Ford, P. J., and Moss, J., concurred.

The petition of plaintiffs and appellants for a hearing by the Supreme Court was denied April 23, 1969. Peters, J., was of the opinion that the petition should be granted.