[Civ. No. 38863. Second Dist., Div. Two. Mar. 26, 1973.]

NATALIE GRASKO et al., Plaintiffs and Respondents, v.
LOS ANGELES CITY BOARD OF EDUCATION et al.,
Defendants and Appellants.

[Civ. No. 40577. Second Dist., Div. Two. Mar. 26, 1973.]

FARREL T. MILES et al., Plaintiffs and Respondents, v.
UNITED TEACHERS-LOS ANGELES et al.,
Defendants and Appellants.

(Consolidated Cases.)

## Counsel

Geffner & Satzman, Leo Geffner, Lawrence B. Trygstad, Donald W. O'Dell and Richard C. Anthony for Defendants and Appellants.

Robert H. Chanin as Amicus Curiae on behalf of Defendants and Appellants.

Roberts, Carmack, & Johnson, John K. Carmack, Sherman Lee Lister and Robert H. Monson for Plaintiffs and Respondents.

John D. Maharg, County Counsel, Clarence H. Langstaff, Assistant County Counsel, and Allan B. McKittrick, Deputy County Counsel, as Amici Curiae on behalf of Plaintiffs and Respondents.

## Opinion

**HERNDON, J.**—These cases present an appeal from a permanent injunction issued by the superior court enjoining the Los Angeles City Board of Education and the Negotiating Council,[1] representing the city's teachers,

[1] The Negotiating Council is the body established pursuant to Education Code section 13085, composed of representatives of qualifying employee organizations (i.e., teachers' unions) in districts with more than one such organization. At the time

from entering into the agreement which resulted from the negotiations that led to the settlement of the 1970 teachers' strike. By stipulation, the two cases have been consolidated on appeal, as they were for trial, since the relevant facts and the legal issues are identical.

## The Facts

On April 13, 1970, approximately 12,000 of a total of approximately 25,000 certificated teachers in the Los Angeles Unified School District went on strike. In spite of the efforts exerted by the parties involved, the strike continued for approximately four-and-one-half weeks until May 13, 1970. In an attempt to resolve the underlying disputes giving rise to the strike, the parties agreed to the appointment of a mediator, Professor Benjamin Aaron of the U.C.L.A. school of industrial relations, to assist them in mutually resolving their differences. After several unsuccessful attempts to assist the parties in resolving these matters, Professor Aaron announced that he intended to submit, and shortly thereafter did in fact prepare and issue, a proposed written agreement which he strongly and publicly urged the parties to adopt as a means of settling the strike.

Although the original amendment proposed by Professor Aaron proved unacceptable to the board of education, a majority of the board (four of the seven members with three members dissenting) subsequently agreed to enter into a modified version of this written agreement with the Negotiating Council. This modified agreement resulted from negotiations by the representatives of the majority members of the board and the Negotiating Council, which negotiations centered upon altering the proposed Aaron agreement to make it satisfactory to both parties.

Thereafter, in the cases of Grasko, et al. v. Los Angeles City Board of Education, et al. and Miles, et al. v. United Teachers-Los Angeles, et al., consolidated for trial, the superior court, on May 21, 1970, issued a preliminary injunction prohibiting the parties from entering into the proposed agreement. Whereupon, the board of education adopted a resolution indicating that ". . . in the event the legal restrictions presently restraining the Board of Education and Negotiating Council from signing the recently negotiated Agreement are removed, the Board of Education will sign the Agreement without further amendment or negotiations."

of the events herein involved, the Negotiating Council in the Los Angeles Unified School District was composed entirely of representatives of United Teachers-Los Angeles (UTLA), which was the predominant teachers' union, representing at the time approximately 22,000 of the approximately 25,000 teachers of the district.

By virtue of the 1970 amendments to the Winton Act, this body is now denominated the Certified Employee Council (Ed. Code, § 13085).

After the parties had been so enjoined by the superior court from executing the proposed agreement, and apparently with the intent to implement the provisions of the proposed agreement by other means to the extent permissible, the board of education considered the adoption of "Board Rule 3700." This proposed board rule in large part parallels and otherwise includes the major substantive provisions of the proposed agreement. On May 28, 1970, in the case of Citizens Legal Defense Alliance, Inc., et al. v. Los Angeles City Board of Education, et al., the superior court issued a temporary restraining order enjoining the board of education from proceeding to adopt or implement the proposed Board Rule 3700.

After a lengthy trial on the merits, the trial court found, inter alia, that "[i]n its decision to execute the contract, the Board of Education intended to establish a certain relationship with UTLA whereunder the Board of Education would share its powers, duties and responsibilities to manage, control and organize the school district with UTLA." This was accomplished by recognition of the Negotiating Council as the bargaining agent for all certificated employees of the school district (except for administrative, supervisory, and medical personnel) and recognition of UTLA as the agent of the Negotiating Council. The agreement also covered matters of benefits, conditions of employment, a grievance and arbitration procedure, joint study committees, and other matters.

The court also found that except for the illegal teachers' strike,[2] the board of education would not have agreed to enter into the agreement herein involved.

The court's conclusions of law reveal that the injunctions are based on several grounds: (1) the proposed agreement was the product of unlawful collective bargaining and an unlawful teachers' strike; (2) the proposed settlement is beyond the power of the Negotiating Council to execute or implement; (3) the proposed agreement is beyond the power of either the board of education or the school district to execute or implement. The reasoning underlying the latter two conclusions was expressed by the trial court thusly: "The Negotiating Council may 'meet and confer' with the public school employer but such 'meet and confer' sessions cannot legally result in more than a unilateral determination by the public school employer of policy in the form of rules, regulations, policies or resolutions respecting the matters for which the 'meet and confer' sessions are held; which rules, regulations, policies or resolutions must be subject

---

[2]The illegality of the instant strike was confirmed in *Los Angeles Unified School Dist.* v. *United Teachers*, 24 Cal.App.3d 142 [100 Cal.Rptr. 806].

to modification at the pleasure of the Board of Education of the public school employer."

The judgments enjoined the school district, board of education and the superintendent of schools from recognizing either UTLA or the Negotiating Council as the sole bargaining agent for all teachers of the school district and from entering into the proposed agreement. UTLA was enjoined from holding itself out as the teachers' sole bargaining agent and from entering into the proposed agreement. Finally, the defendant members of the Negotiating Council, and their successors, were enjoined from holding themselves out as the teachers' sole bargaining agent, or recognizing UTLA as the sole bargaining agent, or entering into the proposed agreement.

Notice of appeal was seasonably filed by UTLA, the defendant members of the Negotiating Council, and the board of education. Thereafter, pursuant to a board motion adopted by a 4-2 vote, the board of education abandoned its appeals in these cases and the companion case of Citizens Legal Defense Alliance, Inc., et al. v. Los Angeles City Board of Education, et al., 2d Civil No. 38864.[3] A motion by the two dissenting members of the board to reinstate these appeals and to permit them to prosecute the appeals in their individual capacity was denied by division four of this court on February 9, 1972.

## Issues Presented

Appellants contend that the "primary and fundamental question presented by this appeal is whether or not the Los Angeles City Board of Education and the Negotiating Council . . . may enter into the employment contract which contains understandings and agreements reached as a result of meeting and conferring pursuant to the Winton Act. . . ." Respondents contend that the original agreement creates a collective bargaining relationship, which, under the Winton Act (Ed. Code, §§ 13080-13088), is beyond the power of the school district or its board, or the Negotiating Council, to enter into; that the agreement is replete with unlawful delegations of the board's discretionary and legislative powers; and that the agreement is against public policy and supported by unlawful consideration in that it is a direct result of an illegal teachers' strike.

---

[3]The appeals were ultimately dismissed on January 10, 1972 as to the board of education only for failure to file a brief (Cal. Rules of Court, rule 17(a)). As the board was the only appellant in the Citizens Legal Defense Alliance case—the case that enjoined the board from adopting the proposed Board Rule 3700—that judgment has long since become final. Accordingly, the legality of the proposed Board Rule 3700 is not before this court.

At the outset, it is imperative to focus precisely upon what is and what is not involved in the instant appeals. As indicated above, the judgments enjoined the board of education from recognizing UTLA or the Negotiating Council as the sole bargaining agent for all teachers and from entering into the proposed agreement. UTLA was enjoined from holding itself out as the teachers' sole bargaining agent and from entering into the proposed agreement and the Negotiating Council was enjoined from holding itself out as the sole bargaining agent, or recognizing UTLA as the sole bargaining agent, or entering into the proposed agreement. Appellants' arguments, as their own characterization of the question presented indicates, go solely to the question of whether the board may, in the exercise of its own discretion, choose to enter into the proposed agreement. We perceive no challenge to those aspects of the injunctions prohibiting UTLA or the Negotiating Council from holding themselves out as the sole bargaining agent for the district's teachers. And, as explained in footnote 3, *supra,* the legality of the proposed Board Rule 3700 is not presented in the instant appeal.

### The Agreement Was Properly Enjoined as Contrary to Public Policy

The trial court found that had the illegal teachers' strike not occurred, the board of education would not have consented to enter into the agreement herein involved. Appellants do not challenge the sufficiency of the evidence to support this finding.

In view of the length of the strike, the number of teachers involved, and the effect of the strike upon the school district, it is readily apparent that the termination of the strike formed a substantial part of the consideration for the proposed agreement, as the court's findings clearly imply.

The agreement is therefore invalid since that consideration was not lawful. (Civ. Code, §§ 1607, 1667.)[4]

We think the reasoning of the Wyoming Supreme Court in *Campbell* v. *Prater,* 64 Wyo. 293 [191 P.2d 160], is particularly apropos here. In that case, the court held that an agreement by a husband to waive his statutory rights to elect to take against his wife's will in order to induce

---

[4]Civil Code section 1607 provides: "The consideration of a contract must be lawful within the meaning of section sixteen hundred and sixty-seven."
Civil Code section 1667 provides: "That is not lawful which is:
"1. Contrary to an express provision of law;
"2. *Contrary to the policy of express law, though not expressly prohibited;* or,
"3. Otherwise contrary to good morals." (Italics added.)

his wife to return to him where, without cause, she had deserted him, was against public policy and void. The court explained:

"When the courts say that bargains like that in the case at bar are against public policy, they do not mean that the wife in promising to return to her husband, or in performing that promise, does anything contrary to law or public opinion. What they mean is that it is contrary to public policy for a wife, who has left her husband without just cause, to exact a consideration for her return. It has been said that *'Just as a contract may be invalid because it is contrary to public policy in its substance and purposes, so it may be invalid because it is contrary to public policy in respect of the coercive method of its procurement.'* Salmond on Contracts, 1947 Ed., 286, quoted from an earlier edition in *Mutual Finance v. John Wetton & Sons* [1937], 2 K.B. 389. See, also, Restatement of Contracts, § 578." (Italics added.) (64 Wyo. at p. 311, 191 P.2d at p. 166.)

The parallel is obvious, and we hold that it was contrary to public policy for public school employees who were conducting an illegal strike to exact a consideration for the cessation of that illegal activity. The subject agreement was therefore void (not merely voidable) and the trial court properly enjoined its threatened consummation.

The injunctions, however, were of a permanent nature and prohibited entering into the agreement either "directly or indirectly." Thus, the further question remains: may the board of education and the Negotiating Council enter into the same or a similar agreement now or in the future if it is the result of a legal stimulus? It is to this question, which presents issues that go to the heart of employer-employee relations in the public schools, that we shall momentarily turn our attention. Prior to that, however, we must consider the contention of respondents that these appeals should be dismissed because the issues are now moot.

### The Appeals Should Not Be Dismissed for Mootness

██ Respondents contend that because of changes in the composition (and presumably the philosophy) of the organizations involved and the fact that the proposed agreement was by its own terms to expire in June, 1971, the cases have now become moot and should therefore be dismissed.

██ It is true that the duty of an appellate court is "to decide actual controversies . . . and not to give opinions upon moot questions or

abstract propositions, or to declare principles or rules of law which cannot affect the matter in issue in the case before it." (*Consol. etc. Corp.* v. *United A. etc. Workers,* 27 Cal.2d 859, 863 [167 P.2d 725]; quoting from *Mills* v. *Green,* 159 U.S. 651, 653 [40 L.Ed. 293, 293-294, 16 S.Ct. 132].)

A case, of course, is not moot if any material question remains that affects the substantive rights of the parties. ▮ And, as suggested above, the "directly or indirectly" language in the injunctions could be construed as prohibiting the execution of any similar agreement in the future. Certainly, this sort of construction would be the most consistent with the trial court's reasoning which included conclusions that agreements of this type were beyond the powers of the public school employer or the Negotiating Council. So construed, the material question of the rights of the parties to enter into similar agreements in the future would remain, and the case would manifestly not be moot.

There is yet another reason why this court should decide the question of the powers of the public school employer to enter into agreements of this sort. ▮ Even if we were to regard the controversy as moot as to the particular parties involved, it is well established that where the question is one of general public interest and there is a reasonable probability that the same question will arise again, the appellate court should nevertheless adjudicate the issues involved. (*Diamond* v. *Bland,* 3 Cal.3d 653, 657 [91 Cal.Rptr. 501, 477 P.2d 733]; *Montalvo* v. *Madera Unified Sch. Dist. Bd. of Education,* 21 Cal.App.3d 323, 329 [98 Cal.Rptr. 593]; *People* v. *West Coast Shows, Inc.,* 10 Cal.App.3d 462, 468 [89 Cal.Rptr. 290].) ▮ The factors cited by respondents do not suffice to indicate that the *issue,* as opposed to a similar controversy between the same parties, will not arise again.

And all of the indications are that the question of the power of a board of education to enter into comprehensive employment agreements with representatives of its employees will arise again. In the instant case, the board's president, Arthur Gardner testified that for its own reasons the board had already decided to enter into an agreement with the Negotiating Council, if a satisfactory agreement could be reached, even before the strike occurred.[5] It is easily imaginable that these sorts of reasons could

---

[5]These reasons may be summarized as follows:

1. The school board desired to plan its budget for a school year with the costs clearly determined on the items of employer and employee relations within the scope of the Winton Act on a final understanding with the Negotiating Council prior to the opening of the school year and prior to the adoption of a final budget.

2. The school board desired to have a one-year comprehensive agreement with the

appeal to the Los Angeles Board or any other board in the future and give rise to an agreement, although the precise terms would probably differ. In such a situation, these same questions concerning the power of a board of education to enter into an agreement covering employment conditions would probably be raised by "others similarly situated" (*Montalvo* v. *Madera Unified Sch. Dist. Bd. of Education, supra,* 21 Cal.App.3d 323, 329). Indeed our attention has been drawn to the fact that the same sort of question has in fact arisen again.[6] Accordingly, we hold that even if this case were to be considered moot as between the particular parties involved, it presents a question of sufficient public interest and likelihood of recurrence that a determination of the question of the power of the parties to enter into this sort of agreement should be made by the appellate court at this time.

■ *California School Districts and Their Governing Boards Are Not Authorized to Enter Into Binding Agreements With Representatives of Their Employees Regarding Matters of Employment Conditions or Educational Policy*

■ We begin our inquiry mindful of the fact that "[t]he powers, duties and obligations of a school district must be found within the limits of the statutory provisions governing school districts. In this connection it has been affirmed that school districts are quasi-municipal corporations of the most limited power known to the law. Their trustees have special powers and cannot exceed the limit of such powers. [Citations.]" (*Hutton* v. *Pasadena City Schools,* 261 Cal.App.2d 586, 592 [68 Cal.Rptr. 103].)

■ A school district, "being neither a natural nor an artificial person, does not enjoy the same natural privileges . . . as do such persons."

Negotiating Council so that the administrative staff could devote more time within the school year to implementing the terms and conditions of school board-employee relations and with the Negotiating Council.

3. The school board desired to eliminate the Negotiating Council's practice of requesting numerous meetings to discuss a wide variety of subjects that involved continuous meetings with the Negotiating Council throughout the school year which in turn involve a substantial amount of time by the superintendent and the administrative staff as well as the time of the school board members.

In an amicus curiae brief filed by the National Education Association, it is further suggested that a public school employer might wish to execute such an agreement, even if it would not necessarily be bound by all of its terms, as a symbolic gesture to indicate the employer's good faith or intention to adhere to certain policies (at least in the absence of a compelling change of circumstances) or some similar sort of moral commitment.

[6]San Juan Teachers Assoc., et al. v. San Juan Unified School Dist., superior court No. 215618, in which the Superior Court of the County of Sacramento concluded that the school district ". . . may, but is not required to, enter into a legally-binding agreement relating to wages, hours, and other working conditions. . . ."

(*Grigsby* v. *King*, 202 Cal. 299, 304 [260 P. 789].) In general, the governing board of a school district has the power to contract on behalf of the district, but only to the extent that power is given either expressly or by necessary implication by the Legislature. (43 Cal.Jur.2d, Rev., Schools, § 211.)

Employer-employee relations in private industry are generally governed by the National Labor Relations Act and section 923 of the Labor Code, which secures substantially similar rights for employees in intrastate business. (*Nutter* v. *City of Santa Monica*, 74 Cal.App.2d 292, 298 [168 P.2d 741].) Public employees, however, have historically been on an entirely different footing, and separate and distinctive legislative treatment has been given to the regulation of their employment relations.

Employment relations between school district employees and their public employer have been governed by the Winton Act (Ed. Code, § 13080 et seq.) since 1965. Viewed in its historical perspective, the Winton Act was the product of an evolutionary process. Recognizing the comparatively recent demands of public employees for a more effective and meaningful voice in determining the terms and conditions of their employment, the Legislature has, particularly over the last couple of decades, attempted to extend to public employees *appropriate* opportunities to participate in these determinations. In so doing, the Legislature has had to consider not only whether various procedures which have played a traditional role in labor relations in the private sector—such as collective bargaining, exclusive representation and strikes—are appropriately applicable in light of the general differences between the public and private sector, *but also in view of the wide variety of occupations and professions encompassed within the field of public employment*. (See *California Federation of Teachers* v. *Oxnard Elementary Schools*, 272 Cal.App.2d 514, 521-523 [77 Cal.Rptr. 497].)

For most public employees, the Meyers-Milias-Brown Act (Gov. Code, § 3500 et seq.)[7] provides the framework for their labor relations with the public employer. From 1961 until the adoption of the Winton Act in 1965, public school employees were within this framework. When they were singled out for separate treatment, the scheme created by the Legislature was in many respects similar, but it featured a number of innovations as well. Perhaps the most notable of these was the creation of a Negotiating Council for school districts where there was more than one employee organization, based on proportional representation, rejecting the

---

[7]Prior to 1968, known as the "Brown Act."

traditional collective bargaining approach of having a single employee organization represent all certificated employees.[8] Of equal notoriety is the fact that under the Winton Act, the authorized representatives of the employees[9] are intended to meet and confer with the school board or its representatives not only with respect to the traditional matters of employment conditions such as wages, but also concerning educational policy (Ed. Code, § 13085). This specific mandate that employees are to be involved in the determination of policy is a feature unique to the Winton Act and stands as a striking example of the aforementioned attempt by the Legislature to adapt to the wide variety of occupations and professions included among its employees. It is a recognition that school teachers, because of their expertise and dedication to the welfare of the schools and their pupils, are particularly well suited to make a constructive contribution to the formulation of policy. (See *California Federation of Teachers* v. *Oxnard Elementary Schools, supra,* 272 Cal.App.2d 514, 532.)

■ Clearly, the Winton Act anticipates that labor relations between a public school employer and its employees should not be of the same nature, or employ the same procedures, as have evolved in the private sector. It is firmly established that the Winton Act does not authorize collective bargaining. (*California Federation of Teachers* v. *Oxnard Elementary Schools, supra,* 272 Cal.App.2d 514; *Berkeley Teachers Assn.* v. *Board of Education, supra,* 254 Cal.App.2d 660.)

But this does not dispose of the question, for the fact that the Legislature undoubtedly intended to create a relationship substantially different from the normal pattern of private labor relations in no way indicates that it has necessarily rejected every feature in common with the private model.[10]

■ Appellants' basic position is that the Winton Act creates only a general framework and that in the absence of specific restrictions the means of implementing this framework are left to the discretion of the board of education. Since it is clear that the Winton Act anticipates meaningful discussions between the board and the Negotiating Council

[8]"This rejection has been recognized as a novel innovation in the field of public employment . . . ." (*Berkeley Teachers Assn.* v. *Board of Education,* 254 Cal. App.2d 660, 672, fn. 12 [62 Cal.Rptr. 515].)

[9]The employee organization for that district or the Negotiating Council, depending on whether there is more than one employee organization (Ed. Code, § 13085).

[10]It is largely for this reason that we cannot place much reliance on respondents' extensive survey of amendments to the Winton Act, proposing various collective bargaining features, that have failed to pass the Legislature. Some of these bills, however, did involve the concept under question here, that of a *written contract,* and we shall consider them presently.

which must result in understandings or agreements, and since there is no *express* prohibition against entering into binding agreements incorporating these areas of agreement, it is contended that whether such an agreement should be entered into or not is a matter committed to the board's discretion.

Although there is considerable appeal in appellants' position, we conclude that the trial court correctly interpreted the law and we likewise hold that under the Winton Act any agreements reached as a result of the meet and confer sessions must be implemented in the form of resolutions, regulations or policies of the governing board of the public school employer which, except as otherwise provided by law,[11] must be subject to change at the board's pleasure.

This conclusion flows compellingly from an examination of the relevant legislative history. The concept of a written contract between the Negotiating Council, or some employee representative, and a school district governing board has been presented to the Legislature several times since the inception of the Winton Act without success. Many of these ill-fated bills involved numerous changes in the framework of public employer-employee relations and it is therefore hazardous to attempt to isolate any particular reason for their defeat or to infer therefrom legislative hostility to the concept of a binding agreement. But the developments surrounding Senate Bill 1232 in 1969 are illuminating. That bill would have added a section 13085.2, authorizing the public school employer and the Negotiating Council to execute a written contract, which was permitted to include a provision for binding arbitration and could specify that it would remain in effect for any term the parties could agree upon, apparently without restriction.

The Senate adopted several amendments proposed by the author to Senate Bill 1232, including the elimination of the provisions regarding a written contract. (Sen. J. for June 16, 1969, pp. 3071-3073; Sen. Bill 1232, as amended June 16, 1969, page 4, line 35—page 5, line 24.) The "written contract" was replaced with a "written memorandum of understanding" which was not to be binding and was to be presented to the governing board for determination. (Sen. Bill 1232, as amended June 16,

---

[11]It has been frequently said that the rules and regulations of the board in effect on the date of the making of the teachers' employment contract are deemed a part of that contract. (*Heckley* v. *Board of Education*, 53 Cal.2d 218, 220-221 [1 Cal. Rptr. 4, 347 P.2d 4]; *Holbrook* v. *Board of Education*, 37 Cal.2d 316, 331-332 [231 P.2d 853]; *Rible* v. *Hughes*, 24 Cal.2d 437, 443 [150 P.2d 455, 154 A.L.R. 137].) The effect of this rule on the board's power to effectuate a change in its rules during the term (usually one year) of the contract is unclear.

1969, page 3, line 46—page 4, line 3.) In that form, the bill passed the Senate by a vote of 24 to 6 on July 24, 1969. (Sen. J. for July 24, 1969, p. 4682.) The bill was amended twice in the Assembly. One of those amendments eliminated the provisions requiring the preparation of a written memorandum of understanding. (Assem. J. for August 1, 1969, pp. 7332-7334; Sen. Bill 1232, as amended August 1, 1969, p. 4, lines 24-33.) On August 8, 1969, the Assembly passed the bill as amended. (Assem. J. for August 8, 1969, p. 8018.) On the same day, the Senate refused to concur in the amendments. (Sen. J. for August 8, 1969, p. 5558.) The bill died in conference committee.

This does not present a legislative hostility to written agreements for public employees generally, but rather a rejection of such agreements in the particular context of education. For in 1968, the Legislature had amended the Meyers-Milias-Brown Act (Gov. Code, § 3500 et seq.), which applies to public employees not covered by specific legislation, by adding section 3505.1, providing for a nonbinding written memorandum of understanding.

In 1970, the Winton Act was amended to add a definition of the critical term meet and confer: " 'Meet and confer' means that a public school employer, or such representatives as it may designate, and representatives of employee organizations shall have the mutual obligation to exchange freely information, opinions, and proposals; and to make and consider recommendations under orderly procedures in a conscientious effort to reach agreement *by written resolution, regulation, or policy of the governing board* effectuating such recommendations." (Ed. Code, § 13081, subd. (d); italics added.)[12]

Viewed in isolation, any one of these legislative actions could conceivably be glossed over, but their combined impact can admit of no other conclusion but that the Legislature has determined that binding written contracts or agreements have no place in the field of labor relations between a public school employer and its employees.

We do not think that *East Bay Mun. Employees Union v. County of Alameda,* 3 Cal.App.3d 578 [83 Cal.Rptr. 503], militates against this result. In that case, certain empolyees had engaged in a brief work stcppage and had returned to work in reliance on the county's promise that there would be no recriminations. The Court of Appeal ruled that the allegations of the petition for writ of mandate stated a good cause of

---

[12]The use of the term "recommendations" reinforces our construction. Nor should the implications of the change of the name in 1970 from "Negotiating Council" to "Certificated Employee Council" be overlooked.

action based on violation of (a) the county's civil service regulations, (b) the antidiscrimination clause of section 3506 of the Government Code, and (c) the agreement reached regarding no recriminations.

We note initially that *East Bay* involved the Brown Act as it existed prior to the 1968 amendment. The opinion does not indicate that its conclusion was reached after consideration of a legislative history at all comparable to that presented by the instant case. Moreover, the holding is that alleged violations of the regulations, antidiscrimination clause, and the agreement states a cause of action, and the court's basis for distinguishing *Social Workers Union Local 535* v. *County of Los Angeles,* 270 Cal.App.2d 65 [75 Cal.Rptr. 566], indicates that the court would perhaps have taken a different view if the agreement alone had been involved.

Nor is this case controlled by *Youngman* v. *Nevada Irrigation Dist.,* 70 Cal.2d 240 [74 Cal.Rptr. 398, 449 P.2d 462]. There the Supreme Court considered whether the irrigation district could be held bound under theories of implied or express contracts to grant annual pay increases. Appellants grossly misconstrue the applicability of this case to the issue at bar. The issue was whether this commitment was a part of the employment contract *with each individual employee.* Nowhere is the question of the propriety of consummating an agreement with *the union* discussed, as the conspicuous absence of any reference to the Meyers-Milias-Brown Act would indicate. The implied contract theory rested on an announced practice " 'contained in Personnel Policies adopted by the District after discussion and negotiation with the IBEW, and disseminated to its employees.' " (70 Cal.2d at p. 245.) The alleged express contract was based, not on an agreement with the union, but on representations made directly to Youngman, the employee.

The above discussion disposes of the primary issue presented by appellants. Their other contentions are patently lacking in merit and warrant no more than summary treatment.

■ We find no merit in appellants' contention that the different rights afforded teachers with respect to entering into contracts concerning employment conditions, as compared with the rights given under the Meyers-Milias-Brown Act, violate the equal protection clause. We are guided here by the principle, recently reaffirmed by the Supreme Court, that " '[w]ide discretion is vested in the Legislature in making the classification and every presumption is in favor of the validity of the statute; the decision of the Legislature as to what is a sufficient distinction to warrant the classi-

fication will not be overthrown by the courts unless it is palpably arbitrary and beyond rational doubt erroneous. [Citations.] A distinction in legislation is not arbitrary if any set of facts reasonably can be conceived that would sustain it.'" (*Mathews* v. *Workmen's Comp. Appeals Bd.*, 6 Cal.3d 719, 738-739 [101 Cal.Rptr. 301, 493 P.2d 1165], quoting from *Sacramento M. U. Dist.* v. *P.G. & E. Co.*, 20 Cal.2d 684 [128 P.2d 529].)

Since we are here concerned with an area of economic regulation rather than a "suspect classification" or a "fundamental interest," we employ the less stringent reviewing standard of the rationality of the classification. (See *Sail'er Inn, Inc.* v. *Kirby*, 5 Cal.3d 1, 16 [95 Cal.Rptr. 329, 485 P.2d 529].) Public school teachers have, of course, no fundamental right under either the federal or state Constitution to bargain collectively.

In *California Federation of Teachers* v. *Oxnard Elementary Schools, supra,* 272 Cal.App.2d 514, the court examined at great length the propriety of separate classification of teachers. The reasoning of that decision is eminently sound, and we perceive no reason to burden this opinion with another explanation of the many sound reasons that exist for treating public school employees separately.

Appellants next contend, without citation of case authority, that the superior court's injunctions are in violation of section 526 of the Code of Civil Procedure, which provides that an injunction may not be granted to restrain the legislative act of a legislative body such as a school board. We do not regard the execution of the subject contract as a legislative, as opposed to an administrative, act. (See *Kleiber* v. *City etc. of San Francisco,* 18 Cal.2d 718, 722-723 [117 P.2d 657].) Moreover, an exception appears to exist if a showing of invalidity is made. (*Agnew* v. *City of Los Angeles,* 190 Cal.App.2d 820, 828 [12 Cal.Rptr. 507]; see *City of Los Angeles* v. *Superior Court,* 51 Cal.2d 423, 430 [333 P.2d 745].)

Finally, we will note that we have considered appellants' contention that the contemporaneous administrative construction of the Winton Act by other school districts should guide our decision. But in the final analysis, the task of statutory construction rests with the courts, and we think that less deference to the administrative construction is in order when the question involves the *extent* of the district's power especially where the district's construction is clearly conditioned by rather insistent pressure to construe its grant of power in a particular way.

Similarly, because the Winton Act represents a statutory plan that is clearly unique, and the question is satisfactorily resolvable without resort

to the persuasive value of foreign opinions, we do not regard it as proper to discuss the several out-of-state opinions referred to in appellants' brief.

In light of our holding that the public school employer lacks the power to enter into the proposed agreement, it is unnecessary to consider the various issues raised by respondents' challenge of various provisions of the agreement as unlawful delegations of the discretionary power of the board of education. Nor need we consider respondents' contention that the Negotiating Council is an entity that lacks the power to contract.

The judgments are affirmed.

Roth, P. J., and Fleming, J., concurred.