[S.F. No. 23210. In Bank. Apr. 4, 1975.]

CITY AND COUNTY OF SAN FRANCISCO et al., Petitioners, v. NATHAN B. COOPER, as Controller, etc., Respondent; GEORGE A. BANGS et al., Real Parties in Interest.

[Text redacted]

**COUNSEL**

Thomas M. O'Connor, City Attorney, and George E. Baglin, Deputy City Attorney, for Petitioners.

Evelle J. Younger, Attorney General, Carl Boronkay, Assistant Attorney General, Anthony C. Joseph and Anthony M. Summers, Deputy Attorneys General, as Amici Curiae on behalf of Petitioners.

Nathan B. Cooper, in pro. per., for Respondent.

Littler, Mendelson & Fastiff, J. Richard Thesing, William C. Wright, Nancy L. Ober, Van Bourg, Allen, Weinberg, Williams & Roger, Levy, Van Bourg & Hackler, Victor J. Van Bourg, Stewart Weinberg, David A. Rosenfeld, Reynold H. Colvin and Jacobs, Blanckenburg, May & Colvin for Real Parties in Interest.

William L. Ferdon, Robert W. Tollen and Chickering & Gregory as Amici Curiae.

## OPINION

**TOBRINER, J.**—In March 1974 numerous workers employed by the City and County of San Francisco and a large number of school teachers employed by the San Francisco Unified School District went on strike in protest of salary and fringe benefit proposals then under consideration for the upcoming 1974-1975 fiscal year. During the course of the two strikes, discussions were undertaken between employee association representatives and representatives of the two municipal employers, the city and the school district. Ultimately these "meet and confer" or negotiating sessions culminated in the adoption of separate legislative measures by the board of supervisors and the governing board of the school district.

Shortly after the enactment of these measures, real party in interest, George Bangs, filed two taxpayer actions in the superior court challenging, on a variety of grounds, the validity of both the city's salary standardization ordinance and the school district's salary schedule resolution. After determining that these taxpayer actions raised substantial questions as to the validity of the challenged ordinance and resolution, respondent, Nathan Cooper, Controller of the City and County of San Francisco, refused to implement the newly enacted measures at the commencement of the 1974-1975 fiscal year and continued to authorize salary warrants only on the basis of the 1973-1974 pay rates. The city and the school district then filed the instant proceeding seeking a writ of mandate to compel the controller to draw and deliver warrants reflecting the salary increases granted by the new ordinance and resolution. The taxpayer, in his return to the alternative writ, opposes the requested relief, arguing that both the city ordinance and school district resolution are invalid for a number of distinct reasons.[1]

As discussed at length below, we have concluded that although portions of both the challenged ordinance and resolution are invalid, the

[1]Returns to the alternative writ have been filed by a number of parties. Respondent Cooper has filed a brief return, confirming that he has refused to draw warrants reflecting the new salary increases and explaining his action on the ground that the pending taxpayer actions cast doubt on the validity of such increase; Cooper's return stipulates that counsel for real party in interest Bangs will defend his refusal to comply with the new enactments. Taxpayer Bangs has filed the main return in opposition to the issuance of a peremptory writ. The employee associations that participated in the "meet and confer" sessions are also named as real parties in interest in this mandate proceeding, and have filed returns urging this court to issue the requested writ.

In addition to these formal pleadings, numerous amicus briefs have been filed in support of both sides of this controversy.

present pleadings do not demonstrate that either measure fails in its entirety and, in particular, do not establish that the basic salary schedules which lie at the heart of the legislative enactments are invalid. Accordingly, we have determined that a writ of mandate should issue compelling the controller to draw and deliver salary warrants reflecting the newly adopted salary schedules.

As we explain initially, although the taxpayer claims that both legislative measures are invalid in their entirety because they were adopted "as a result of," and "under the coercion of," an illegal public employee strike, the controlling authorities clearly establish that such a contention does not constitute a permissible basis for invalidating duly enacted legislation. In the absence of a constitutional, statutory or charter provision prohibiting a local legislative body from exercising its legislative power to settle an "illegal" strike, the judiciary has no authority to withdraw the legislative prerogative on the basis of allegedly improper influences brought to bear upon individual legislators. In this realm, legislative judgment and wisdom are reviewable only by the electorate, not by the courts.

Second, we shall explain that the taxpayer has not established that the challenged ordinance conflicts with the controlling "prevailing wage" provisions of the city charter. Although the taxpayer alleges that the salary schedule is "arbitrary, palpably unreasonable and constitutes an abuse of discretion," these conclusory allegations are inadequate in themselves to demonstrate the invalidity of the ordinance, and they are not sufficiently substantiated by the taxpayer's more specific averments. We do, however, agree with the taxpayer's contention that the board of supervisors was without authority to adopt a separate portion of the ordinance establishing a city-financed employee dental plan, in light of a specific city charter provision delegating authority for the establishment of such a plan to a separately constituted health service board.

Finally, we shall point out that the school board resolution is not invalid under the Winton Act (Ed. Code, § 13080 et seq.), even though it was enacted subsequent to, and adopted the substance of, a written "agreement," prepared as a result of numerous "meet and confer" sessions between employee and employer representatives. As we explain, although the Winton Act withholds binding legal effect from any agreement entered into by meeting and conferring representatives, the school board itself, through a formal resolution, adopted the measure at issue here. Since the Winton Act, by its own terms, defines the objective

of the meet and confer process to be a "written resolution . . . of the governing board effectuating [the] recommendations [of the conferring representatives]" (Ed. Code, § 13081, subd. (d)), the fact that the school board decided to adopt the recommendations emerging from the meet and confer sessions obviously represents no violation of the act. Although we do find that one portion of the resolution, purporting to grant employee association representatives a "veto" power over subsequent changes in school board policy, constitutes an invalid delegation of power, this provision is severable from the remainder of the resolution and does not taint the salary increase.

### 1. *The facts of the instant case.*

As already noted, the instant proceeding involves the validity of two separate and distinct legislative measures, a city ordinance (No. 152-74) and a school district resolution (No. 44-9-Sp 1). Although the circumstances leading to the enactment of these two measures are in some respects interrelated, the relevant facts are sufficiently distinct to necessitate a separate discussion of each enactment.

### (a) *Ordinance No. 152-74*

Under the Charter of the City and County of San Francisco (hereafter "San Francisco city charter" or "city charter"), the compensation paid to a large number of city employees (sometimes referred to as "miscellaneous employees" or "employees subject to salary standardization") is established by the board of supervisors pursuant to a "prevailing wage" standard. Section 8.401 of the charter provides that for such employees the compensation fixed by the board "shall be in accord with the generally prevailing rates of wages for like service and working conditions in private employment or in other comparable governmental organizations in this state"; sections 8.400 and 8.401 establish the procedure leading up to the board's ultimate fixing of compensation.

In brief, these charter provisions direct the city civil service commission to conduct surveys of comparable jobs throughout the state and, on the basis of the data collected in such surveys, to recommend to the board of supervisors a wage schedule which will provide salaries in accord with "prevailing wages" to all employees subject to salary standardization. The board of supervisors then reviews this data and, after considering additional information gathered on its own, "may approve, amend or reject" the commission's recommendation. If the

board decides to alter the commission's recommendation, however, the charter provides that the board shall transmit the data upon which it has relied to the civil service commission "for review and analysis," and the commission is directed to make a report on the proposed changes to the board.[2]

On January 15, 1974, the civil service commission formally presented to the board of supervisors its recommendations for the 1974-1975 salary schedule based on data gathered from its surveys. The commission's recommendation divided the relevant employees into three groups: (1) for those employees whose salaries, under the commission's analysis, were found to be equal to or 1 percent below "prevailing wages," the commission recommended no increase; (2) for those employees whose salaries, again under the commission's analysis, were from 1 percent to 4 percent below "prevailing wages," the commission recommended a 2-1/2 percent increase; and (3) for those employees whose salaries, in the commission's opinion, were 4 percent or more below "prevailing wages," the commission recommended a 5 percent increase. The commission estimated the total cost of its "0-2-1/2-5%" salary proposal at $4.8 million.

After two public hearings before the board of supervisor's legislative and personnel committee, the committee presented the matter to the full board on March 4, 1974, recommending that the commission's "0-2-1/2-5%" proposal be revised to a "2-3-5%" formula, retaining the same classifications proposed in the commission's recommendation.[3] The total cost of this 2-3-5 percent plan was estimated at $5.5 million. A majority of the board of supervisors tentatively approved this amended formula at the March 4 meeting and the final vote on the proposed ordinance was scheduled for the board's next regular meeting on March 11.

---

[2]The relevant portion of section 8.401 states: "The board of supervisors may approve, amend or reject the schedule of compensation proposed by the civil service commission; provided, that before making any amendment thereto the data considered by the board of supervisors as warranting such amendment shall be transmitted to the civil service commission for review and analysis and the commission shall make a report thereon to the board of supervisors, together with a report as to what other changes, and the cost thereof such proposed amendments would require to maintain an equitable relationship with other rates in such schedule."

[3]In other words, employees whose salaries the commission found to be 1 percent or less below prevailing wages would receive a 2 percent raise; employees whose salaries were found to be 1 to 4 percent below prevailing wages would receive a 3 percent raise; and employees whose salaries were found to be 4 percent or more below prevailing wages would receive a 5 percent raise.

Many employees were evidently extremely dissatisfied with the tentatively approved salary ordinance and on the following day, March 5, union leaders representing a number of the affected workers announced that union members would commence strike activity on March 7. A strike did begin on March 7, with striking employees establishing picket lines at City Hall and at municipal facilities throughout the city. Many employees refused to cross such picket lines and for the duration of the strike most municipal services were either greatly reduced or curtailed completely.

Shortly after the strike began, a number of members of the board of supervisors commenced closed session discussions with representatives of the various employee organizations. These discussions continued intermittently throughout the strike. In the early morning hours of March 15, one week after the strike had begun, several members of the board of supervisors and representatives of the various unions announced that they had reached an agreement ending the strike. Later that same day, the board of supervisors met in regular session and tentatively approved ordinance No. 152-74, the salary ordinance challenged in the instant proceeding; 10 days later, on March 25, 1974, the board finally enacted the ordinance. On March 27, the mayor signed the ordinance into law.

Ordinance No. 152-74 grants all miscellaneous employees subject to salary standardization a $45 per month increase for the first six months of the 1974-1975 fiscal year and a $55 per month increase for the last six months of the fiscal year. The ordinance also contains a provision establishing a dental plan with city contributions to be limited to $7 per employee per month, the total cost not to exceed $500,000 per year. Finally the ordinance implements various "internal adjustments" at a cost of approximately $80,000. The taxpayer contends that the total cost of these provisions amounts to approximately $12 million.

b. *Resolution No. 44-9-Sp 1*

Under the provisions of both the city charter and the Education Code, the San Francisco School Board is authorized to "fix, alter and approve" the salary and other forms of compensation of certificated employees of the San Francisco Unified School District. (San Francisco Charter, § 5.101; Ed. Code, § 13502.) Unlike the salaries of the miscellaneous city employees discussed above, the compensation of "certificated" employees—in general, teachers and other professionals employed by the district—is not governed by a "prevailing wage" provision. Except as

otherwise provided by state law, the school board enjoys plenary authority in establishing the salary of its certified employees. (See, e.g., *Rible* v. *Hughes* (1944) 24 Cal.2d 437, 443-444 [150 P.2d 455, 154 A.L.R. 137]; *Abraham* v. *Sims* (1935) 2 Cal.2d 698, 711 [34 P.2d 790, 42 P.2d 1029].)

The Winton Act, however, grants certificated employees a means of participating in the district's determination of wages and working conditions. The Winton Act provides that before the school district takes action on a wide range of subjects, including employee wages and working conditions, it must "meet and confer" with representatives of recognized employee associations if they so request. (See Ed. Code, §§ 13080, 13084, 13085, 13089.) Under the act, if there is more than one certificated employee association in a single school district, the "meet and confer" sessions take place between representatives of the school district and a "certificated employee council." (Ed. Code, § 13085.) In San Francisco, the certificated employee council is composed of nine representatives from three separate employee organizations: the San Francisco Federation of Teachers, Local 61, AFT-AFL-CIO (hereafter "Local 61"), the San Francisco Classroom Teachers Association (hereafter "Classroom Teachers Association"), and the San Francisco Personnel and Guidance Association.

Pursuant to its obligations under the Winton Act, the school district scheduled a "meet and confer" session with the certificated employee council to discuss proposals for the 1974-1975 school year salary schedule. The first session took place on March 7, 1974, by coincidence the first day of the city employee strike. When this initial meet and confer session ended without agreement, the membership of one of the employee associations, Local 61, voted to and did commence a strike against the district on March 8, 1974. On March 25, 1974, the membership of the Classroom Teachers Association joined the striking Local 61.

Throughout the strike, the employee council and representatives of the school board held numerous "meet and confer" sessions. On March 26, 1974, one day after the Classroom Teachers Association had joined the strike, the district representatives and the employee council met again and reached agreement with respect to a variety of issues, including a 6 percent salary increase for all certificated employees. Thereafter, the representatives of the district and the employee council embodied the agreement in a written memorandum of understanding and on March 29, 1974, signed the written memorandum.

The first paragraph of the document declares that the respective participants in the meet and confer sessions have reached "the following MEMORANDUM OF UNDERSTANDING . . . subject to adoption and ratification by their respective principals." The memorandum then contains a series of numbered paragraphs providing (1) that the memorandum "shall be binding and effective" from July 1, 1974, to June 30, 1975, (2) that no change in the memorandum "shall be valid unless . . . ratified by the Board and . . . the constituent organizations of the Certificated Employees Council," (3) that the provisions of the memorandum "shall be incorporated and become an integral part of the 1974-75 Certificated Salary Schedule of the San Francisco Unified School District," (4) that the provisions of the memorandum are severable, and that if any provision is invalidated "[t]he parties will meet . . . for the purpose of renegotiating the provision or provisions affected," (5) that "[t]he Board will amend its policies and take such other action by resolution or otherwise" to give full force and effect to the memorandum, (6) that nothing in the memorandum shall be construed to reduce current teachers benefits, and (7) that the board agrees that "there will be no reprisal against any employee's participation in the strike . . . ."

Finally, the memorandum contains 31 separately numbered paragraphs dealing with the substantive terms or recommendations of the agreement; the first such paragraph calls for a "six percent cost of living increase for all teachers" and subsequent paragraphs deal either with similar compensation and working condition matters or with issues of broader educational policy.

On April 9, 1974, the school district's governing board met in formal session and enacted resolution No. 44-9-Sp 1, the resolution at issue in this case. The resolution declares that the provisions of the March 29 memorandum of understanding "are incorporated into and become an integral part of the 1974-75 Certificated and Classified Salary Schedules of the San Francisco School District and . . . shall be deemed to be incorporated into and be a part of the employment conditions of all teachers employed by the district for 1974-75. . . ."

Shortly after the enactment of both city ordinance No. 152-74 and school board resolution No. 44-9-Sp 1, George Bangs, a taxpayer residing in San Francisco, commenced two separate taxpayer suits in the superior court, seeking to enjoin the city from implementing either of the legislative measures on the ground that each measure was invalid in its entirety. The main thrust of the initial complaint in each action was that

each of the measures was void because enacted as the result of the coercive pressure of an illegal public employee strike; the complaints also, however, attacked other alleged defects in the measures.

On June 18, 1974, shortly before the new salary schedules were to go into effect, respondent Cooper, the city controller, issued an official departmental instruction, declaring that pending final adjudication of Bangs' taxpayer suits, wages for city employees subject to salary standardization and for certificated employees of the school district would be paid only on the basis of the 1973-1974 pay rates.

On July 3, 1974, the city and its unified school district commenced the instant proceeding, seeking a writ of mandate to compel the controller "to draw and deliver salary warrants reflecting the salary increases granted by Ordinance 152-74 and Resolution 44-9-Sp 1." ■ The cases clearly establish this procedure as an appropriate means to challenge the controller's refusal to implement a duly enacted salary measure and to secure a determination as to the validity of the legislation in question. (See, e.g., *City and County of S. F.* v. *Boyd* (1943) 22 Cal.2d 685 [140 P.2d 666].) In light of the important questions presented, we granted an alternative writ of mandate.

Both respondent Cooper and real party in interest Bangs have filed returns in this matter, with Bangs taking the laboring oar in urging a denial of the requested writ. The taxpayer's return contends that both the ordinance and resolution are invalid in a number of respects. In the following sections of this opinion we discuss each of the contentions raised. First, we address the contention—applicable to both the city ordinance and the school board resolution—that the enactments are invalid because adopted as the result of an illegal strike. Second, we discuss the additional allegations raised with respect to the city ordinance. Third, and finally, we analyze the additional contentions pertaining to the validity of the school board resolution.

2. ■ *In the absence of applicable constitutional, legislative, or charter proscriptions, a duly enacted legislative measure cannot be invalidated on the ground that it was enacted as a result of an illegal strike.*

Our analysis must begin with the recognition that the ordinance and resolution at issue here are clearly legislative in nature. (See, e.g., *Kugler*

v. *Yocum* (1968) 69 Cal.2d 371, 374 [71 Cal.Rptr. 687, 445 P.2d 303]; *City and County of S. F.* v. *Boyd, supra,* 22 Cal.2d 685, 689.) The taxpayer's initial challenge to these legislative measures rests upon the contention that both measures were enacted under the coercive influence of an "illegal" public employee strike.

In characterizing the employee work stoppage at issue as "illegal," the taxpayer relies on a series of Court of Appeal decisions which have concluded that under the present state of California law public employees do not have the right to strike.[4] The return filed by the various real party in interest employee associations contests this conclusion, arguing both that present state statutes implicitly authorize strikes by some categories of public employees,[5] and also that by the very legislative measures challenged in this action the City of San Francisco has impliedly sanctioned public employee strikes.

We have no occasion to resolve this controversy in the present action, however, for even if we assume that all public employee strikes are illegal, and may properly be enjoined under a court's equity power (see, e.g., *City of San Diego* v. *American Federation of State etc. Employees, supra,* 8 Cal.App.3d 308, 317; *School Dist. for City of Holland* v. *Holland Educ. Assn.* (1968) 380 Mich. 314 [157 N.W.2d 206, 210]; *Timberlane Reg. Sch. Dist.* v. *Timberlane Reg. Ed. Ass'n* (1974) 114 N.H. 245 [317 A.2d 555, 558-559]) or may subject striking employees to a variety of administrative sanctions including dismissal (see *Almond* v. *County of Sacramento, supra,* 276 Cal.App.2d 32, 34-35), it does not follow that legislative enactments which "result from" such illegal strikes are therefore invalid. On the contrary, as we discuss below, a firmly established judicial principle decrees that "a legislative act cannot be [nullified] because, in the opinion of a court, it was or might have been the result of improper considerations." (*People* v. *County of Glenn* (1893) 100 Cal. 419, 423 [35 P. 302].)

---

[4]See *Los Angeles Unified School Dist.* v. *United Teachers* (1972) 24 Cal.App.3d 142 [100 Cal.Rptr. 806]; *Trustees of Cal. State Colleges* v. *Local 1352, S.F. State etc. Teachers* (1970) 13 Cal.App.3d 863 [92 Cal.Rptr. 134]; *City of San Diego* v. *American Federation of State etc. Employees* (1970) 8 Cal.App.3d 308 [87 Cal.Rptr. 258]; *Almond* v. *County of Sacramento* (1969) 276 Cal.App.2d 32 [80 Cal.Rptr. 518].

[5]The only general state statute which specifically speaks to the public employee strike issue is Labor Code section 1962, which prohibits strikes by firefighters. The employee associations argue that the absence of a similar statutory prohibition of other public employee strikes represents an implicit authorization of such action. (Cf. *Los Angeles Met. Transit Authority* v. *Brotherhood of Railroad Trainmen* (1960) 54 Cal.2d 684, 687-691 [8 Cal.Rptr. 1, 355 P.2d 905].)

Unlike several of our sister states,[6] California has no constitutional or legislative provisions prescribing mandatory sanctions for striking public employees. Similarly, the San Francisco city charter contains no such provision. Thus, as the taxpayer apparently concedes, when the board of supervisors and the board of education enacted the measures at issue here, there was no constitutional, statutory or charter provision which barred either body from enacting legislation in response to, or as a result of, an "illegal" public employee strike.

The taxpayer asserts, however, that despite the absence of any applicable constitutional, statutory or charter limitation, this court can and should void these legislative measures because the enactments were "caused" by illegal influences, namely, an illegal strike. The taxpayer's theory founders on the "wise and ancient doctrine" (*United States* v. *Constantine* (1935) 296 U.S. 287, 299 [80 L.Ed. 233, 241, 56 S.Ct. 223] (dissenting opn. by Cardozo, J.) that the validity of legislative acts must be measured by the terms of the legislation itself, and not by the motives of, or influences upon, the legislators who enacted the measure. As we observed in *Wilke & Holzheiser, Inc.* v. *Dept. of Alcoholic Bev. Control* (1966) 65 Cal.2d 349, 364 [55 Cal.Rptr. 23, 420 P.2d 735]: " ' "[A] judiciary must judge by results, not by the varied factors which may have determined legislators' votes. . . ." ' [Citation.]"

This principle was articulated and explained by Chief Justice Marshall in the seminal decision of *Fletcher* v. *Peck* (1810) 10 U.S. (6 Cranch) 87 [3 L.Ed. 162]. In *Fletcher* an act of the Georgia Legislature, selling public land to private parties, was challenged on the ground that the purchasers of the property had secured the enactment of the legislation by bribing the members of the legislature. Although finding such corruption deplorable, the United States Supreme Court suggested that the law could not be voided on such grounds.

In *Fletcher* Justice Marshall explained: "It may well be doubted, how far the validity of a law depends upon the motives of its framers, and how far the particular inducements, operating on members of the supreme sovereign power of a state . . . are examinable in a court of justice. If the principle be conceded, that an act of the supreme sovereign power might be declared null by a court, in consequence of the means which procured it, still would there be much difficulty in saying to what

---

[6]See, e.g., Ohio Revised Code, sections 4117.01-4117.05; N.Y. Civil Service Law, Consolidated Laws, chapter 7, article 14, sections 200-212 ("Taylor Law"). See generally 37 A.L.R.3d 1147, 1163-1168, section 4.

extent those means must be applied to produce this effect. Must it be direct corruption? or would interest or undue influence of any kind be sufficient? Must the vitiating cause operate on a majority? or on what number of the members? . . . If the majority of the legislature be corrupted, it may well be doubted, whether it be within the province of the judiciary to control their conduct, and, if less than a majority act from impure motives, the principle by which judicial interference would be regulated, is not clearly discerned." (10 U.S. at pp. 129-130 [3 L.Ed. at p. 176].)

As this passage from *Fletcher* suggests, any judicial attempt to determine the validity of legislation upon the basis of the motives of, or influences upon, particular legislators must inevitably prove a hazardous and largely futile task. Because the enactment of legislation is a collective process in which numerous individually motivated legislators participate, it is impossible to determine with certainty whether a particular "improper influence" or "motive" was "actually" responsible for the enactment of a law; moreover, the practical difficulties are compounded by the fact that each individual legislator will often, if not always, act out of a variety of motives and under a diverse set of influences. Thus, any attempt to determine the "actual" effect of the allegedly illegal strike on the minds of the legislators would hardly be a sound basis for invalidating legislation.

Moreover, in several respects judicial non-intervention is more appropriate in the instant case than in either *Fletcher* or much of *Fletcher's* progeny. Unlike *Fletcher,* there are no allegations here that the legislators acted from corrupt or fraudulent motives; thus, this is not a case in which the judiciary finds itself in the position of affirming the personal aggrandizement of lawmakers at the expense of the public. (Cf. *Maxwell* v. *City of Santa Rosa* (1959) 53 Cal.2d 274 [1 Cal.Rptr. 334, 347 P.2d 678]; *Nickerson* v. *San Bernardino* (1918) 179 Cal. 518, 522-523 (dictum) [177 P. 465].) Nor is this a case in which legislators are alleged to have enacted legislation for a constitutionally impermissible reason, such as the promotion or establishment of religion (cf. *Board of Education* v. *Allen* (1968) 392 U.S. 236, 243 [20 L.Ed.2d 1060, 1065, 88 S.Ct. 1923]), although even in such circumstances it is far from clear that the legislation would be invalid. (See, e.g., *Palmer* v. *Thompson* (1971) 403 U.S. 217, 224-225 [29 L.Ed.2d 438, 444-445, 91 S.Ct. 1940]; *United States* v. *O'Brien* (1968) 391 U.S. 367, 383-384 [20 L.Ed.2d 672, 683-684, 88 S.Ct. 1673]; but cf. *Parr* v. *Municipal Court* (1971) 3 Cal.3d 861, 865-868 [92 Cal.Rptr. 153, 479 P.2d 353].)

Instead, the taxpayer's present argument reduces to a contention that

even though no corruption, fraud or unconstitutional purpose taints a legislative measure, the enactment may still be struck down because some of the proponents and benefactors of the measure have engaged in improper activity. The present instance is by no means the first time legislation has been challenged on the basis of allegedly improper or coercive tactics used to secure its passage. In no case to date, however, has such an attack been successful.

*People* v. *Bigler* (1855) 5 Cal. 23 is an early California case in point. In *Bigler* an act of the Legislature moving the state capitol from San Jose to Vallejo was attacked on the ground that General Vallejo's payment of a large sum of money to the state brought about the legislation and that such conduct amounted to an improper "sale of the Seat of Government." (5 Cal. at p. 26.) The *Bigler* court rejected the challenge and held that even if General Vallejo's action could be considered improper that conclusion would not deprive the Legislature of its constitutional authority to transfer the seat of government.

Justice Holmes' opinion for the United States Supreme Court in *Calder* v. *Michigan* (1910) 218 U.S. 591 [54 L.Ed. 1163, 31 S.Ct. 122] confirms *Bigler*'s analysis. In *Calder,* a repeal of legislation was challenged on the ground that a mayor and other city officials had "carried out an unfair scheme for getting the repeal hurried through the [state] legislature without notice to the [complaining] company." Justice Holmes rejected the argument out of hand, emphasizing that "we do not inquire into the knowledge, negligence, methods or motives of the Legislature if, as in this case, the repeal was passed in due form. [Citation.] The only question that we can consider is whether there is anything relevant to the present case in the terms or effect of the repeal that goes beyond the power [of the legislative body]." (218 U.S. at p. 598 [54 L.Ed. at p. 1167].)

■ ■■■ At the heart of the decision in *Bigler* and *Calder* lies the separation of powers doctrine, the fundamental doctrine which recognizes that in the absence of some overriding constitutional, statutory or charter proscription, the judiciary has no authority to invalidate duly enacted legislation.[7] The taxpayer's contention flies in the

---

[7]We explained in our recent decision in *County of Los Angeles* v. *Superior Court* (Burroughs) (1975) *ante*, pp. 721, 726 [119 Cal.Rptr. 631, 532 P.2d 495] and footnote 5, that this principle fully applies to legislative action of local legislative bodies. (See, e.g., *Nickerson* v. *San Bernardino, supra,* 179 Cal. 518, 522-523; *Hadacheck* v. *Alexander* (1915) 169 Cal. 616, 617 [147 P. 259]; 5 McQuillin, Municipal Corporations (3d ed. 1969) § 16.90, pp. 287-290.) As the *Nickerson* court observed: "When the legislature has committed to a municipal body the power to legislate on given subjects . . ., courts of

face of this fundamental principle, asserting that even if no constitutional, statutory or charter provision precludes a local legislative body from enacting particular legislation, the judiciary can still void such legislation if it finds that the measure "resulted from" certain illegal conduct, for example, an illegal strike. In the absence of constitutional, statutory or charter limitations, however, it is the legislative body, and not the courts, which retains the ultimate authority to decide whether certain "illegal" conduct warrants the withholding of beneficial legislation. In other words, although the judiciary may administer various equitable sanctions—such as a restraining injunction—in response to "illegal" conduct, courts simply lack the authority to invoke the sanction of withholding legislative power.

The taxpayer argues, however, that if public employees cannot legally strike, then it follows that any settlement which permits striking employees to secure any benefits resulting from their unlawful conduct would violate public policy and, accordingly, would be void. In support of this argument, the taxpayer relies heavily on the Court of Appeal decision in *Grasko* v. *Los Angeles City Board of Education* (1973) 31 Cal.App.3d 290, 297-298 [107 Cal.Rptr. 334]. In the first portion of the *Grasko* decision (a later section of the opinion will be discussed below), the Court of Appeal held that an employment agreement, entered into by the city board of education in response to an illegal public employee strike, was void as against public policy, because the termination of the illegal strike "formed a substantial part of the consideration" for the agreement. Under the *Grasko* court's reasoning, virtually every agreement entered into by a public entity to settle an "illegal strike" would be void and unenforceable. In reaching this conclusion, the *Grasko* court did not cite or consider the earlier Court of Appeal decision of *East Bay Mun. Employees Union* v. *County of Alameda* (1970) 3 Cal.App.3d 578,

---

equity have no power to interfere with such a body in the exercise of its legislative . . . functions. . . . Whether, in the exercise of legislative powers, a board acts wisely or unwisely is no concern of the courts. They cannot enter the board room and substitute their judgment for that of the board nor interfere at all with its action unless the board is exceeding its legislative powers, or its judgment or discretion is being fraudulently or corruptly exercised."

Although petitioner here, like the taxpayer in the *County of Los Angeles* case, relies heavily upon language in our recent decision in *Strumsky* v. *San Diego County Employees Retirement Assn.* (1974) 11 Cal.3d 28, 36 [112 Cal.Rptr. 805, 520 P.2d 29] to the effect that "the separation of powers doctrine is inapplicable to government below the state level," "the context of *Strumsky* reveals [that] the quoted statement related only to the question of whether local governmental bodies could exercise both judicial and legislative functions. . . ." (*County of Los Angeles* v. *Superior Court, supra, ante,* pp. 721, 727, fn. 5.)

584 [83 Cal.Rptr. 503], which had explicitly affirmed the validity of an agreement entered into by a public employer in the course of a strike settlement.

We cannot subscribe to the *Grasko* court's conclusion that the illegality of a strike necessarily taints any agreement entered into by a public employer to end the strike. (See *Social Workers Union Local 535* v. *County of Los Angeles* (1969) 270 Cal.App.2d 65, 77, fn. 12 [75 Cal.Rptr. 566].) The question as to what sanctions should appropriately be imposed on public employees who engage in illegal strike activity is a complex one which, in itself, raises significant issues of public policy.[8] In the past, several states have attempted to deter public employee strikes by imposing mandatory, draconian statutory sanctions on striking employees; experience has all too frequently demonstrated, however, that such harsh, automatic sanctions do not prevent strikes but instead are counterproductive, exacerbating employer-employee friction and prolonging work stoppages.[9] As a consequence, recent advisory reports prepared by labor relations experts in a number of jurisdictions have uniformly recommended the abandonment of such "automatic" sanctions and have urged the adoption of a variety of discretionary sanctions which provide the public employer a measure of flexibility necessary to meet varying negotiating situations. (See Smith, *State and Local Advisory Reports on Public Employee Labor Relation Legislation: A Comparative Analysis* (1969) 67 Mich.L.Rev. 891, 910-914.)

[8]See generally Wellington & Winter, *Structuring Collective Bargaining in Public Employment* (1970) 79 Yale L.J. 805, 839-842; Smith, *State and Local Advisory Reports on Public Employment Labor Legislation: A Comparative Analysis* (1969) 67 Mich.L.Rev. 891, 910-914; Ligtenberg, *Some Effects of Strikes and Sanctions—Legal and Practical* (1973) 2 J.L. & Ed. 235, 247-252; Comment, *California Assembly Advisory Council's Recommendations on Impasse Resolution Procedures and Public Employee Strikes* (1974) 11 San Diego L.Rev. 473, 475-481; Comment, *Analysis of the Comprehensive Approach to the Public Employee Strike Problem* (1973) 44 Miss.L.J. 766.

[9]As one commentator has recently observed: "[W]hile statutes have banned strikes as a matter of law, even those with the most draconian sanctions have failed to prevent them as a matter of fact when bargaining deadlocks occur. Indeed, the imposition of sanctions may be counterproductive, for both union and government officials may benefit from such occasions for demonstrating personal intrepidity without dealing with the hard problems of settling the underlying dispute." (Bernstein, *Alternatives to the Strike in Public Labor Relations* (1971) 85 Harv.L.Rev. 459, 462-463.)

The experience under the New York Condon-Wadlin Act is illuminating. The Condon-Wadlin Act, adopted in 1947, provided for the automatic dismissal of any striking employee; the act also declared that if such an employee should be rehired, the worker would be ineligible for any pay raise for three years after the strike, and would remain on "probationary" status for five years. In 1966, a transit worker strike occurred in New York City; because of the strict terms of the Condon-Wadlin Act the city was unable to negotiate a speedy settlement. The impasse was only solved when, after a lengthy strike, the state legislature enacted emergency legislation, suspending the

To date, the California Legislature has declined to prescribe any specific sanctions for public employee strikes. Although the taxpayer argues that public employee strikes will not occur if public employers lack the power to grant any benefits to striking employees, recent events throughout the nation belie any such notion. (See authorities cited at fns. 8-9, *supra.*) Under the circumstances, we believe it would be entirely inappropriate for the judiciary to strip from public employers all authority to negotiate a settlement of any illegal strike. (Cf. *Board of Education* v. *Associated teachers* (1972) 30 N.Y.2d 122 [331 N.Y.S.2d 17, 23, 282 N.E.2d 109].)

Moreover, even if we were persuaded of the validity of the *Grasko* "public policy" analysis—which we are not—the legislative measures at issue in this case as explained above could not be invalidated on such a basis. ■ In the absence of controlling constitutional, statutory or charter limitations, local legislators retain authority to determine the appropriate legislative response to an allegedly illegal strike. Some legislators may conclude that it is unwise to respond to any demands voiced through an illegal strike on the ground that such consideration might encourage similar strikes in the future; others may decide that the public interest requires legislative action that recognizes the practical realities of the strike and attempts to ameliorate the underlying dispute. It is, of course, a legislator's prime function to choose between such conflicting policy judgments; in so doing, he or she is directly responsible to the electorate, not to the judiciary. That legislative role signifies the essence of the doctrine of the separation of powers.

■ Thus, even if we assume the illegality of the public employee strike, such illegality affords no basis for invalidating either the salary ordinance or salary resolution at issue in the case at bar. Accordingly, insofar as the taxpayer's attack rests upon the occurrence of an "illegal strike," the challenge fails.

3. *Although the portion of ordinance No. 152-74 establishing a dental plan conflicts with the city charter and is invalid, the return fails to demonstrate that the salary schedule of the ordinance violates the charter's "prevailing wage" provisions.*

operation of the Condon-Wadlin Act with reference to the transit workers and approving salary increases recommended by a mediation panel. (N.Y. Laws of 1966, ch. 6.) Not surprisingly, the entire Condon-Wadlin Act was repealed shortly thereafter. (See Waldman, *Damage Actions and Other Remedies in the Public Employee Strike* (1968) 20th Annual N.Y.U. Conf. on Labor 259, 271-273.)

The taxpayer additionally contends that, without regard to the "illegal" strike, ordinance No. 152-74 is invalid under several distinct provisions of the San Francisco city charter. As we explain below, although we recognize the illegality of one provision of the ordinance, we conclude that the bulk of the ordinance, and particularly the salary schedule, does not succumb to the taxpayer's present attack.

The taxpayer initially asserts that the ordinance fails because the salaries fixed by the enactment's across-the-board $50 per month increase do not "accord with the prevailing rates of wages" as required by section 8.401 of the city charter.[10] ■ Although past California decisions establish that such a charter provision does constitute "a positive limitation on the [board of supervisors'] exercise of discretionary authority in fixing compensation for municipal employees" (*Walker* v. *County of Los Angeles* (1961) 55 Cal.2d 626, 634 [12 Cal.Rptr. 671, 361 P.2d 247]), the authorities make it equally clear that the legislative body retains a considerable degree of discretion in establishing compensation pursuant to such a "prevailing wage" mandate. (See, e.g., *Alameda County Employees' Assn.* v. *County of Alameda* (1973) 30 Cal.App.3d 518, 530 [106 Cal.Rptr. 441]; *Collins* v. *City & Co. of S. F.* (1952) 112 Cal.App.2d 719, 730-731 [247 P.2d 362]; *Goodrich* v. *City of Fresno* (1946) 74 Cal.App.2d 31, 36-37 [167 P.2d 784].)

As the decisions have recognized, some discretionary latitude is implicit in the nature of the "prevailing wage" standard itself; as a rule, such charter provisions do not set forth any specific formula by which the prevailing wage is to be determined, but instead leave to the legislating body the choice between the various reasonable alternative means of calculating "prevailing wages." In addition, because a fair prevailing wage determination may take into account many component elements —such as various fringe benefits—which are frequently not susceptible to precise appraisal, a substantial measure of legislative discretion is inevitable. (See, e.g., *Anderson* v. *Board of Supervisors* (1964) 229 Cal.App.2d 796, 800 [40 Cal.Rptr. 541].)

■ Moreover, the charter provision at issue here simply directs the board of supervisors to fix compensation "in accord with" the generally

[10]Although the city asserts that the taxpayer lacks "standing" to rely on the charter's prevailing wage provisions, arguing that such provisions are basically "minimum wage" laws which can only be enforced at the behest of employees, numerous California decisions have entertained challenges brought by taxpayers claiming that a given wage exceeds prevailing wages. (See, e.g., *City and County of S. F.* v. *Boyd, supra,* 22 Cal.2d 685, 693; *San Francisco Chamber of Commerce* v. *City etc. of S. F.* (1969) 275 Cal.App.2d 499, 500 [79 Cal.Rptr. 915].)

prevailing rates of wages. In *City and County of S. F.* v. *Boyd, supra,* 22 Cal.2d 685, 690, we explained that such a provision does "not require that the rates of wages . . . fixed by the board be identical with or not higher than the generally prevailing rates, but rather that there be a reasonable or just correspondence between the rates established and those elsewhere prevailing, i.e., that they be in harmony with and substantially conform to such other rates." Moreover, we held in *Boyd* that under such a charter provision, "[t]he determination whether proposed rates of compensation are in accord or in harmony with generally prevailing rates is within the discretion of the rate-making authority. The courts will not interfere with that determination unless the action is fraudulent or so palpably unreasonable and arbitrary as to indicate an abuse of discretion as a matter of law." *(Id.)* In emphasizing the limited nature of the judicial review appropriate in such cases, the *Boyd* court declared "that a writ of mandamus should issue [compelling the controller to comply with a duly enacted ordinance] unless it is concluded *'that upon no conceivable basis under all of the evidence . . . can the rates as fixed be brought within the charter limitation.' "* *(Id.)* (Italics added.)

██  Although the return in the instant case does allege that ordinance No. 152-74 is "arbitrary, palpably unreasonable and constitutes an abuse of discretion," such conclusory allegations do not, of course, in themselves suffice to meet the heavy burden required to invalidate a salary ordinance under the principles of *Boyd.* (See, e.g., *Lagiss* v. *County of Contra Costa* (1963) 223 Cal.App.2d 77, 93 [35 Cal.Rptr. 450]; *People* v. *Lagiss* (1958) 160 Cal.App.2d 28, 33 [324 P.2d 926].)

To bolster the return's conclusory allegations, the taxpayer's brief proffers two more specific allegations which assertedly demonstrate that the salary schedule adopted by the present ordinance does not accord with prevailing rates. First, the taxpayer points out not only that the $50 per month across-the-board increase differs fundamentally from the three-tier recommendation submitted by the civil service commission on the basis of its salary surveys but also that it is much more costly than the commission proposal. Second, the taxpayer emphasizes that the terms of the ordinance were reached as a result of a series of negotiating sessions with employee representatives. Although the taxpayer argues that these two circumstances adequately demonstrate that the salaries adopted by the ordinance do not satisfy the charter requirements, we cannot agree.

In the first place, the fact that the salary schedule ultimately adopted by the board differs significantly from that recommended by the

commission in no manner demonstrates that the ordinance's pay rates are not in accord with prevailing rates. As this court has only recently emphasized: "It should be kept in mind that it is the function of the board, not the commission, to fix and pay wages and salaries." (*Los Angeles City etc. Employees Union* v. *Los Angeles City Bd. of Education* (1974) 12 Cal.3d 851, 856 [117 Cal.Rptr. 537, 528 P.2d 353].) Although the commission plays a valuable and important role in gathering data and formulating initial recommendations, both the charter provisions and controlling authorities make clear that "the rates of compensation are fixed by the board of supervisors and involve an exercise of the independent judgment of that body." (*City and County of S. F.* v. *Boyd, supra,* 22 Cal.2d 685, 692.) ▇ Thus, the fact that the board chose to implement a substantially different form of pay increase than the commission had recommended does not in itself establish that the salaries authorized by the ordinance are not in accord with prevailing wages.

The case of *San Francisco Chamber of Commerce* v. *City etc. of S. F., supra,* 275 Cal.App.2d 499 is directly in point. In the *Chamber of Commerce* case the civil service commission recommended the adoption of a four-tiered salary increase (ranging from no increase to a 7 percent increase) to satisfy the charter's prevailing wage provision but the board of supervisors amended the proposed schedule by adopting a 5 percent across-the-board raise. The Chamber of Commerce thereafter attacked the city ordinance as incompatible with the charter's prevailing wage requirements, but the Court of Appeal rejected the challenge, pointing out that in light of numerous factors (e.g., the cost of living in the San Francisco area, comparable pay raises by other California public employers) the 5 percent across-the-board increase did not constitute the type of "clear-cut abuse of legislative discretion" which would warrant judicial intervention. (275 Cal.App.2d at pp. 504-506.)

Similar considerations pertain here. Although the ordinance's $50 per month across-the-board approach unquestionably differs from the commission's recommendation, the returns before this court fail to demonstrate, or even allege, with any specificity exactly which salary levels fixed by the ordinance do not ostensibly accord with prevailing rates. In this regard, the showing made by the instant taxpayer falls far short of that presented—without success—in the *Chamber of Commerce* litigation, and surely fails to meet the heavy burden placed on the taxpayer by *Boyd.*

The taxpayer also claims that the invalidity of the $50 per month increase is established by the fact that the figure was allegedly agreed

upon in the course of a series of negotiating sessions between several members of the board of supervisors and representatives of various employee organizations. This contention appears to rest upon an erroneous assumption that the application of the charter's "prevailing wage" standard inherently conflicts with any "meet and confer" or negotiating process.

As explained above, while the charter's prevailing wage provisions do establish limits within which the board of supervisors must act, the board enjoys a considerable degree of discretion both in determining the prevailing wage standards and in fixing compensation "in accord with" such standards. The "meet and confer" procedure sanctioned by the Meyers-Milias-Brown (MMB) Act (Gov. Code, § 3505; see also San Francisco Charter, §§ 16.200-16.222) can provide a useful channel through which employee representatives may voice suggestions as to how the board's discretion should be exercised. This, of course, does not mean that the "meet and confer" process may supplant the charter's prevailing wage guidelines; the MMB Act itself recognizes the continued validity of such charter provisions. (Gov. Code, § 3500; see San Francisco Charter, § 16.201.) ■ So long as the ordinance which is ultimately adopted conforms to the charter restrictions, however, the board's participation in "meet and confer" sessions constitutes no basis for voiding a subsequent enactment. (Cf. *Alameda County Employees' Assn.* v. *County of Alameda* (1973) 30 Cal.App.3d 518 [106 Cal.Rptr. 441].)

In sum, we conclude that the taxpayer has failed to sustain his considerable burden of demonstrating that " 'upon no conceivable basis under all of the evidence . . . can the rates as fixed be brought within the charter limitation.' " (*City and County of S. F.* v. *Boyd, supra,* 22 Cal.2d 685, 690.) Unlike *Walker* v. *County of Los Angeles, supra,* 55 Cal.2d 626, this is not a case in which the official record of the board itself unequivocally demonstrates that the legislative body did not comply with the charter provision. And, unlike *Sanders* v. *City of Los Angeles* (1967) 252 Cal.App.2d 488 [60 Cal.Rptr. 539], this is not a case in which the legislative body has been led astray by a deceptive report prepared by a city administrative officer. ■ ■ Upon the present record, we are not prepared to hold that the wage increases of $50 per month per employee are so out of line as to constitute "palpably unreasonable and arbitrary" legislative action.[11]

---

[11]The taxpayer additionally contends that the city failed to comply fully with one of the procedural requirements mandated by section 8.401 of the charter. As noted above,

■ We do agree, however, with the taxpayer's further contention that under the city charter the board of supervisors lacked authority to enact section XII of the ordinance,[12] which purports to establish a city-financed dental plan.[13] Section 8.420 of the charter establishes a distinct San Francisco Health Service Board to oversee the establishment and administration of all "medical care" plans for the city employees. Sections 8.421 and 8.422, in turn, delegate to this health service board the initial authority for developing new "medical care" plans; the sections also provide that after a proposed plan has been adopted by two-thirds of the health service board, such plan is then transmitted to the board of supervisors where it may be enacted into law if it gains the approval of three-fourths of the boards' members.[14] Although section 8.430 of the

section 8.401 provides that before the board of supervisors adopts a schedule of compensation different from that proposed by the civil service commission, the board is to transmit to the commission the data it relied on in making the alterations and the commission in turn is to make a report to the board "as to what other changes, and the cost thereof, such proposed amendments would require to maintain an equitable relationship with other rates in such schedule." (See fn. 2, *supra*.) Although the taxpayer avers that the city failed to comply with this procedure, this allegation is contained only in an unverified portion of the return, and thus may not properly be considered at issue in this mandamus proceeding. (Cal. Rules of Court, rule 56(c); see *Benjamin Franklin B. & I. Corp.* v. *Schmidt* (1933) 132 Cal.App. 39, 40 [22 P.2d 26].) Moreover, the replication filed by the city completely undermines the unverified allegation, for the city's responsive pleading contains a copy of the very report of the civil service commission called for by section 8.401, which was before the board of supervisors when it adopted the challenged ordinance. Accordingly, the taxpayer's procedural objection is without merit.

[12]Section XII of the ordinance provides in relevant part: "A dental plan shall be provided to permanent employees whose compensation are subject to the provisions of section 8.400 and section 8.401 of the charter. The city's contribution shall be limited to an amount not to exceed $7.00 per month, per employee, and the total city yearly contribution shall not exceed $500,000. The benefits provided under the dental plan shall be limited to permanent employees only, exclusive of dependents."

[13]Although the city contends that the validity of the dental plan provision is not properly at issue in the present proceeding, we do not agree. It has long been clear, of course, that fringe benefits, such as the challenged dental plan, form an integral part of an employee's compensation or "full salary" (see, e.g., *Mass.* v. *Board of Education* (1964) 61 Cal.2d 612, 623 [39 Cal.Rptr. 739, 394 P.2d 579]) and we believe that under the present pleadings the controller's obligation to pay all compensation authorized by the ordinance has properly been brought into question.

[14]Section 8.421 provides: "The medical plans in effect on the effective date hereof shall continue in force and effect until rescinded or superseded by a new plan or plans adopted by the health service board and approved by ordinance of the board of supervisors, adopted by three-fourths of its members."

Section 8.422 provides in relevant part: "The board shall have power and it shall be its duty by a two-thirds vote of the entire membership of the health service board to adopt a plan or plans for rendering medical care to members of the system or for the indemnification of the cost of said care, or for obtaining and carrying insurance against such costs or for such care. . . .

"The board of supervisors shall receive an actuarial report of the costs and effect of any proposed change in the benefits of the health service system or ratio of contributio..

charter leaves to the health service board the precise definition of "medical care," the legislative history of the provision and other sections of the charter indicate quite clearly that the city's health service system was intended to encompass dental care plans.[15] In its present petition and replication, the city has made no attempt to defend the board of supervisors' entry into a field which the charter appears clearly to have delegated to the city health service board. Accordingly, we conclude that section XII of the ordinance is invalid.

The invalidity of the dental plan provision of the ordinance, however, does not taint the remainder of the legislation. Section XII of the ordinance is clearly distinct and severable from the salary schedule authorized by the ordinance; the taxpayer does not contend otherwise. ▪ Accordingly, we conclude that with the exception of section XII, ordinance No. 152-74 is valid.

4. *Resolution No. 44-9-Sp 1 was not adopted in violation of the Winton Act or the city charter. Although a portion of the resolution purporting to grant the Certificated Employee Council a veto over future changes in school board policy is invalid, that provision is severable and does not taint the entire resolution.*

As we have already discussed, the school board resolution at issue here cannot be overturned on the ground that it resulted from an illegal strike. The taxpayer, however, raises a series of additional objections to the resolution which we must now address. As we shall explain, although one of the taxpayer's criticisms is well taken, that single defect does not invalidate the entire enactment and does not taint the salary schedule.

---

before enacting an ordinance or before voting to submit any proposed charter amendment providing for such a change."

[15]The charter provisions establishing a San Francisco Health Service System were initially approved by the electorate in 1937. As originally enacted, the applicable charter section defined the term "medical care" to include "the services of physicians, surgeons, nurses. . . . and *dental*, optical and other medical treatments and services." (Former § 172.1, subd. 5.) In 1957, the electorate substituted the present section 8.430, which provides simply that: "The term 'medical care' shall be defined by the health services board." As the 1957 election brochure argument clearly implies, the amendment was not intended to withdraw the health service board's authority with respect to the previously specified services, but rather was apparently aimed at liberalizing employment benefits by empowering the board to include additional health services within the term "medical care."

Section 3.426 of the charter, which provides that for purposes of the Health Service System the term "physician" includes "dentists," buttresses our conclusion that the charter provisions vest the health service board with exclusive jurisdiction to initiate a city-financed dental plan.

The taxpayer initially argues that the instant school board resolution was adopted in violation of several provisions of the Winton Act (Ed. Code, § 13080 et seq.). From 1961 to 1965, the labor relations of public school employees and employers were governed by the terms of the Brown Act (Gov. Code, § 3525 et seq.), an enactment which applied to most public employees throughout the state.[16] In 1965, the Legislature enacted the Winton Act which established a separate labor relations framework for employees and employers in the state public school system.

The Winton Act, while preserving many of the basic concepts of the original Brown Act, also introduced several innovative features into the public school labor relations process. Two of the innovations have drawn particular attention: first, the act rejected the traditional concept of a single employee "bargaining agent" and established a "negotiating council" (now termed the "certificated employee council") based on proportional representation among all employee organizations which represent certificated employees within a district (Ed. Code, § 13085; see *California Federation of Teachers* v. *Oxnard Elementary Sch.* (1969) 272 Cal.App.2d 514 [77 Cal.Rptr. 497]); second, the act expanded the scope of the matters on which employees have a right to "meet and confer" with their employers beyond the traditional "wages, hours and working conditions" to encompass issues of broad educational policy as well. (Ed. Code, §§ 13080, 13085; see *San Juan Teachers Assn.* v. *San Juan Unified Sch. Dist.* (1974) 44 Cal.App.3d 232 [118 Cal.Rptr. 662].) This latter innovation has been explained as "a recognition that school teachers, because of their expertise and dedication to the welfare of the schools and their pupils, are particularly well suited to make a constructive contribution to the formulation of policy." (*Grasko* v. *Los Angeles City Board of Education* (1973) 31 Cal.App.3d 290, 302 [107 Cal.Rptr. 334].)

The controversy in the instant case, however, does not directly involve either of these innovative features of the Winton Act, but rather concerns the proper interpretation of two separate sections of the act relating to the "meet and confer" process established by the legislation. The specific provisions at issue are Education Code section 13081, subdivision (d) and section 13088. Section 13081, subdivision (d) provides: " 'Meet and

[16]Since 1968, the Meyers-Milias-Brown Act (Gov. Code, § 3500 et seq.) has constituted the primary state legislation governing the labor affairs of public employees employed by local governments. The original Brown Act, however, continues to govern the labor relations of many state employees. (See generally Grodin, *Public Employee Bargaining in California: The Meyers-Milias-Brown Act in the Courts* (1972) 23 Hastings L.J. 719, 719-721.)

confer' means that a public school employer, or such representative as it may designate, and representatives of employee organizations shall have the mutual obligation to exchange freely information, opinions, and proposals; and to make and consider recommendations under orderly procedures *in a conscientious effort to reach agreement by written resolution, regulation, or policy of the governing board effectuating such recommendations."* (Italics added.) Section 13088 provides in relevant part: "The enactment of this article . . . shall not be construed as prohibiting a public school employer from making the final decision with regard to all matters specified under section 13085."

As our earlier discussion of the facts indicates, in the instant case the school board, by formal resolution, adopted the provisions of a written memorandum of understanding to which representatives of the school district and the certificated employee council had agreed after a series of "meet and confer" sessions. The taxpayer now contends that this school board resolution fails in its entirety because it allegedly rests upon a purportedly "binding" agreement which the school board or its representatives had no authority to execute. In support of this contention, the taxpayer relies heavily on a portion of the Court of Appeal decision of *Grasko* v. *Los Angeles City Board of Education, supra,* 31 Cal.App.3d 290, 300-307. As we explain, however, *Grasko* does not support the contention that the school board resolution is invalid.

In *Grasko,* the issue before the court did not turn upon whether a resolution, formally adopted by a board of education, was valid or not under the Winton Act, but rather whether, in the absence of such a resolution, a school board or its representatives had the authority to enter into a *binding written agreement* with representatives of employee associations. ██ The *Grasko* court resolved this latter question in the negative, concluding that under the act a written agreement, though executed by representatives of both the employer and employees, could not, *in itself,* legally bind the school board. We agree with this conclusion. By the specific terms of section 13081, subdivision (d), the Winton Act provides that binding decisions arising out of the "meet and confer" process must be culminated *"by written resolution, regulation, or policy of the governing board* effectuating [the negotiators'] recommendations." (Italics added.) This language leaves no doubt that the Legislature intended to require the members of the school board themselves to approve, by formal board action, any "recommendations" before they became legally binding upon the district. Section 13088, quoted above, simply reinforces this conclusion. For this reason, the written memoran-

dum of understanding executed by the meeting and conferring representatives in the present case in itself creates no legally binding rights against the school district.

The legal duty sought to be enforced in the case at bar, however, does not arise from the contractual memorandum of understanding, but rather from resolution No. 44-9-Sp 1, a formal school board resolution adopted at an official meeting by the governing board of the school district. Far from supporting the taxpayer's challenge to this resolution, the *Grasko* decision makes clear that such a formal resolution is entirely consistent with, and, in fact, contemplated by, the Winton Act. ■ As the *Grasko* court observed: "[U]nder the Winton Act any agreements reached as a result of the meet and confer sessions must be implemented in the form of *resolutions*, regulations or policies of the governing board of the public school employer . . . ." (Italics added.) (31 Cal.App.3d at p. 303.)

The taxpayer further contends, however, that the resolution at issue here is "tainted" by the "invalidity" of the preceding memorandum of understanding. The taxpayer appears to find three separate defects in the adopted procedure. In our view, the Winton Act fails to sustain any of the three objections.

First, the taxpayer points out that the resolution of the board simply incorporated the substantive terms of the memorandum of understanding; if the memorandum cannot stand, the taxpayer argues, neither can the resolution. This reasoning is simply a non sequitur. The memorandum of understanding is "invalid," or, more precisely unenforceable, simply because the Winton Act provides that binding agreements in this context can only be implemented through formal board action. ■ The fact that the board, by formal resolution, chose to *adopt* completely the recommendations resulting from the "meet and confer" process certainly does not invalidate the resolution, for the Winton Act specifically authorizes board resolutions "*effectuating* [the negotiators'] recommendations." (Italics added.) (Ed. Code, § 13081, subd. (d).)

The taxpayer next objects to the written nature of the memorandum of understanding. ■ Although the Winton Act contains no specific provision authorizing meeting and conferring representatives to commit their "recommendations" to writing (cf. Gov. Code, § 3505.1), such authorization may fairly be implied from the terms of the act. In defining the "meet and confer" process, section 13081, subdivision (d) explicitly

authorizes the respective representatives to agree on "recommendations" which may be effectuated by formal school board action. Thus, this section contemplates that such "recommendations" will be communicated to the school board, and since the section does not provide otherwise we see no reason why such communication cannot be accomplished through a written document, as well as through oral presentation.

Thirdly, the taxpayer argues that the ostensible "binding" nature of the memorandum of understanding necessarily taints the subsequent board resolution, contending that in light of this "binding agreement" the school board failed to exercise its legislative discretion when it subsequently incorporated the memorandum into its resolution. In the first place, however, it is not at all clear from the terms of the document that the memorandum was intended to preclude the school board's exercise of its own discretion. Although one passage of the memorandum does state that the memorandum shall be "binding and effective" from July 1, 1974, to June 30, 1975, and another section provides that "the Board will amend its policies . . . to give full force and effect" to the memorandum, the initial paragraph of the document conditions the entire agreement upon the *"adoption and ratification by [the representatives'] respective principals."* (Italics added.) This provision appears to leave the ultimate decision of adopting or rejecting the memorandum of understanding to the full school board.

Moreover, even if the memorandum had purported to be binding on the board without the board's formal affirmance by "written resolution, regulation or policy," the taxpayer has not established that the members of the board of education treated the memorandum as such. As we have explained, under the Winton Act the meeting and conferring representatives of the school board do not have authority to bind the board by signing a written agreement; the board retains the ultimate decision-making authority. ■■■ Under well recognized legal principles, we must presume, in the absence of a contrary showing not demonstrated by the instant record, that the members of the school board complied with their official duty and exercised discretion in enacting the resolution at issue here. (Evid. Code, § 664; see, e.g., McGowan v. Ford (1895) 107 Cal. 177, 186-187 [40 P. 231].) Thus, even if the meeting and conferring representatives of the board did exceed the bounds of their authority in executing a "binding" agreement, such improper action of the board's agents does not suffice to vitiate the duly enacted resolution at issue here.

Accordingly, we conclude that the existence of the March 29 memo-

randum of agreement provides no basis for invalidating resolution No. 44-9-Sp 1.

▇▇▇ In addition to challenging the process by which resolution No. 44-9-Sp 1 was adopted, the taxpayer also attacks one particular section of the resolution, which purports to preclude the board from subsequently revising or altering any of the other provisions of the resolution without the approval of the certificated employee council.[17] The taxpayer contends that this clause represents an improper limitation on subsequent board action and affects a delegation of the board's ultimate decision-making authority which is incompatible with the Winton Act. We believe the taxpayer's objections are well taken and we therefore conclude that the challenged portion of the resolution is invalid.

It is a familiar principle of law that no legislative board, by normal legislative enactment, may divest itself or future boards of the power to enact legislation within its competence. (See, e.g., *Thompson* v. *Board of Trustees* (1904) 144 Cal. 281, 283 [77 P. 951]; *McNeil* v. *City of South Pasadena* (1913) 166 Cal. 153, 155-156 [135 P. 32]; *In re Collie* (1952) 38 Cal.2d 396, 398 [240 P.2d 275].) Thus, a school board cannot, by resolution, bar itself or future boards from adopting subsequent resolutions which may alter earlier established policies. Yet the portion of the resolution presently at issue purports to effectuate just such a result; it seeks to place all the terms of the present resolution beyond the reach of future board action, except as the certificated employee council agrees to such future action. Under the authorities cited above, such a provision cannot stand.

Moreover, the challenged provision exhibits the additional defect of delegating the board's ultimate policy-making authority to private parties in contravention of the Winton Act. Resolution No. 44-9 Sp 1 deals with a wide variety of matters within the board's competence: among other subjects, it fixes the compensation for school board employees, allocates funds between different educational programs, and establishes the district policy on class size goals. The authority exercised by the board in passing on these matters has been specifically granted *to the school board* by various provisions of the Education Code and the San Francisco city charter (e.g., Ed. Code, §§ 931, 939, 1001, 1051, 1052,

---

[17]The second numbered paragraph of the memorandum, incorporated into the resolution, provides: "No change, revision, alteration or modification of this Memorandum of Understanding shall be valid unless the same is ratified by the Board and by action of the constituent organizations of the Certificated Employees Council under the internal rules of the Council, and endorsed in writing by the Board's representative and the chairman of the Certificated Employees Council."

9316, 13502 and 15801; San Francisco Charter, § 5.101); section 13088 of the Education Code contemplates that the board itself will retain the authority to make "the final decision" with respect to such matters. Undoubtedly the provision at issue here, granting the employee council a broad veto power within the board's policy-making domain, conflicts with this legislative mandate. (See *Grasko* v. *Los Angeles City Board of Education, supra,* 31 Cal.App.3d 290, 303; *San Juan Teachers Assn.* v. *San Juan Unified Sch. Dist., supra,* 44 Cal.App.3d 232, 253.) Accordingly, this portion of the resolution is invalid.[18]

Although the taxpayer further asserts that the invalidity of this segment of the resolution taints the entire resolution, in our view the provision is clearly severable.  ▮  As this court has recently reiterated: " '[I]n considering the issue of severability, it must be recognized that the general presumption of constitutionality, fortified by the express statement of a severability clause, normally calls for sustaining any valid portion of a statute unconstitutional in part. This is possible and proper where the language of the statute is mechanically severable, that is, where the valid and invalid parts can be separated by paragraph, sentence, clause, phrase or even single words. . . .' " (Italics deleted.) (*Santa Barbara Sch. Dist.* v. *Superior Court* (1975) 13 Cal.3d 315, 330 [118 Cal.Rptr. 637, 530 P.2d 605] (quoting *In re Blaney* (1947) 30 Cal.2d 643, 655 [184 P.2d 892]).) Resolution No. 44-9-Sp 1 does contain a severability clause[19] and the invalid provision discussed above is unquestionably "mechanically severable" from the remainder of the resolution, being contained entirely in a separate paragraph.

"The final determination depends on whether 'the remainder . . . is

---

[18]It should be noted, however, that our voiding of this portion of the resolution does not leave the school board free to alter all of the provisions of resolution No. 44-9-Sp 1 at will. Past cases clearly indicate, for example, that a school board may not lower salaries fixed by its salary schedule after the beginning of the school year. (See, e.g., *Rible* v. *Hughes* (1944) 24 Cal.2d 437, 444 [150 P.2d 455, 154 A.L.R. 137]; *Abraham* v. *Sims* (1935) 2 Cal.2d 698, 711 [34 P.2d 790, 42 P.2d 1029]; *Aebli* v. *Board of Education* (1944) 62 Cal.App.2d 706, 748-751 [145 P.2d 601]; cf. Ed. Code, § 13510.) This proposition follows from the fact that such salary schedules become an integral part of each teacher's employment contract. (See, e.g., *Holbrook* v. *Board of Education* (1951) 37 Cal.2d 316, 331-332 [231 P.2d 853]; *Rible* v. *Hughes, supra,* 24 Cal.2d 437, 443.) To date, however, the cases have not defined to what extent the principle reflected in the above cited cases would apply to the more general matters of "educational policy,", as contrasted with matters of "wages, hours and working conditions," covered by the instant resolution.

[19]The resolution provides in pertinent part: "If any provision of the Memorandum of Understanding or any application thereof to any teacher or group of teachers is held to be contrary to law by a court of competent jurisdiction, such provision or application will not be deemed valid and subsisting, except to the extent permitted by law, but all other provisions or applications will continue in full force and effect."

complete in itself and would have been adopted by the legislative body had the latter foreseen the partial invalidation of the statute' [citation] or 'constitutes a completely operative expression of the legislative intent . . . [and] [is] [not] so connected with the rest of the statute as to be inseparable.' [Citation.]" (*Santa Barbara Sch. Dist.* v. *Superior Court, supra,* 13 Cal.3d at p. 331.) In the instant case, the additional substantive portions of the resolution can without question stand without the challenged provision, and we have little doubt that the school board did not consider the private "veto" power such an inseparable part of the resolution that it would have declined to enact the resolution in its absence.[20] ▆▆▆ Under these circumstances, we conclude that the invalid provision is severable and does not taint the entire enactment.

▆▆▆ Finally, we reach the taxpayer's concluding contention, in which he asserts that the school board resolution is invalid under section 5.101 of the San Francisco city charter. Section 5.101 provides in part that the school board shall adopt a schedule of salaries for the next ensuing year "between the 1st and 21st day of May of each year." Resolution No. 44-9-Sp 1, however, was adopted on April 9, and the taxpayer contends that this early enactment voids the entire resolution.

(21) As a general rule, an ordinance or resolution of an inferior legislative body is invalid if the mandatory prerequisites to its enactment are not *substantially* observed. (See, e.g., *Walker* v. *County of Los Angeles, supra,* 55 Cal.2d 626, 639; *City and County of S. F.* v. *Boyd, supra,* 22 Cal.2d 685, 692.) ▆▆▆ As far as we have been able to ascertain, section 5.101's "May 1—May 21" requirement was intended to ensure that the school board's salary schedule would be prepared in ample time to be included in the city budget and in the annual determination of the city and county tax rate, and to afford school district employees fair notice of their forthcoming salaries prior to the beginning of the new school year. These purposes were obviously fulfilled in the instant case, since the resolution was adopted well before the May 21 deadline specified by the charter. Under these circumstances, we think it would be entirely improper to void this legislative measure for the technical, insubstantial noncompliance with the city charter provision. The taxpayer has cited no case in which a court has overturned legislation on such an inconsequential basis.

---

[20]The possibility that the employee organizations may have declined to agree to the *memorandum of understanding* without the inclusion of such a clause is, of course, entirely irrelevant to the question of the validity of the *resolution,* adopted pursuant to the independent discretion of the board.

## 5. *Conclusion*

We briefly recapitulate the conclusions we have reached in this opinion. Initially, we hold that neither the ordinance nor the resolution may be invalidated on the basis that it was enacted as a result of an illegal strike. Second, we have determined that although the portion of the ordinance establishing a dental plan is invalid, the present pleadings do not demonstrate that the ordinance's salary schedule conflicts with the city charter's prevailing wage provisions. Finally, we have concluded that the school board resolution was not adopted in violation of the Winton Act, but that a severable portion of the resolution, purporting to grant the certificated employee council a veto over future board decisions, is invalid.

Let a writ of mandate issue, compelling the respondent controller to draw and deliver warrants reflecting the salary increases granted by ordinance No. 152-74 and resolution No. 44-9-Sp 1 as well as prejudgment interest at the legal rate on the withheld salary increases. (Civ. Code, § 3287, subd. (a); see *Sanders* v. *City of Los Angeles* (1970) 3 Cal.3d 252, 262-263 [90 Cal.Rptr. 169, 475 P.2d 201].)

Wright, C. J., McComb, J., Mosk, J., Sullivan, J., Clark, J., and Richardson, J., concurred.

Petitioners' application for a rehearing was denied May 1, 1975, and the judgment was modified to read as printed above.